Filed 7/2/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S051342 |
| v. | ) | |
| | ) | |
| JOHN LEE CUNNINGHAM, | ) | |
| | ) | San Bernardino County |
| Defendant and Appellant. | ) | Super. Ct. No. RCR 22225 |
| _____ | ) | |

In a bench trial before the Superior Court of San Bernardino County, defendant John Lee Cunningham was convicted of the first degree murders of Wayne Sonke, David Smith, and Jose Silva. (Pen. Code, §§ 187, subd. (a), 189.[1]) The trial court found true the special circumstance allegations that defendant committed multiple murders and that the murders of Sonke and Smith took place during the commission of a burglary and a robbery. (§ 190.2, subd. (a)(3), (17)(A) and 17(G).) The court also found defendant guilty of one count of second degree burglary (§ 459), three counts of second degree robbery (§ 211), one count of arson (§ 451, subd. (d)), and one count of possession of a firearm by a felon (former § 12021, subd. (a)). The court further found true various sentencing enhancement allegations—that defendant personally used a firearm in the commission of the murders, robberies, and burglary (former § 12022.5, subd. (a)), had previously been convicted of various felonies (§ 667), and had served prior prison terms for felony convictions (§ 667.5).

---

[1]     All further statutory references are to the Penal Code, unless otherwise noted.

A jury was sworn for the penalty phase and returned a verdict of death. After conducting an automatic review and declining defendant's request to modify the jury's verdict (§ 190.4, subd. (e)), the trial court sentenced him to death for the three first degree murders with special circumstances, as well as to a determinate term of 16 years for the remaining counts and allegations.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I.  FACTS

### A.  *The Guilt Phase*

Defendant went to Surplus Office Sales (SOS) in Ontario, California, around closing time on the afternoon of Saturday, June 27, 1992, and robbed the three remaining employees at gunpoint. He then bound the victims, herded them into a bathroom, and shot them each at least once in the head. Afterward, he set fire to the building before fleeing the scene. He was arrested a month later while on the run from police. Defendant subsequently confessed to the murders, burglary, and robberies, and participated in a videotaped reenactment of the crimes.

Waiving his right to a jury, defendant's bench trial extended over 10 non-contiguous court days. In addition to the prosecution's guilt phase evidence, the trial court considered the evidence presented at the preliminary hearing and at pretrial proceedings concerning defendant's motion to suppress his multiple confessions.

#### 1.  The prosecution's case

##### a)  *The crimes*

Around 4:00 p.m. on June 27, 1992, members of the Ontario Fire Department responding to a call at SOS found an inactive fire in the office portion of the building and three homicide victims in a hallway bathroom. An autopsy revealed that SOS employee Jose Silva died from two gunshot wounds to the head, assistant manager David Smith

2

died from multiple gunshot wounds to the head and neck, and store manager Wayne Sonke died from a single gunshot wound to the head. More than $1,000 in cash had been taken from the store's cash register and petty cash box.

Michael Ray, the owner of SOS, had employed defendant in the early and mid-1980s at two other businesses. About a month before the murders, Ray returned a phone call from defendant asking about work. Ray had not heard from him for three or four years. Defendant also made unannounced visits to SOS on June 20 and 24, a week and a few days before the murders respectively.

About 8:30 p.m. on the evening of the murders, defendant called SOS employee Evelyn Eriksen at home to ask how she was. Defendant told her he had been playing poker with some friends since about noon that day. Later, defendant took Alana Costello, his girlfriend at the time, to the movies and a motel room. Costello was surprised because defendant was not steadily employed and had been under "stress" trying to find enough money for them to move into a bigger apartment. That evening, defendant was "much more close-mouthed" than usual and acting "very stressed, very tense, very wrapped up in himself." According to Costello, defendant generally was distant and removed, had difficulty sleeping, and would wake up in the middle of the night from bad dreams. He had borrowed her Ruger .22-caliber semi-automatic rifle and modified it by sawing off part of the stock and barrel. A few days after the murders, Costello noticed the rifle was missing.

### b) *Defendant's subsequent flight and capture*

On June 30, defendant called Diana Jamison, a former girlfriend. Jamison told defendant that his parole officer had come to her house looking for him. In a later telephone conversation, defendant told Jamison he was on the run because someone, perhaps the Mexican Mafia, was after him. Around the same time, defendant called Jamison upset and crying, saying "something very terrible had happened" and he wanted

3

to come back and "do the right thing." Jamison told defendant to turn himself in. According to Jamison, defendant had trouble sleeping; he would often wake up in the middle of the night in a cold sweat, and mentioned dreams of being tortured by women and children from his time in Vietnam. Defendant had tried to seek counseling at a veteran's center.

On July 1, Costello received a telephone call from defendant asking her to join him in Nevada. Meeting up at the Las Vegas airport, the two traveled by car to Atlantic City, New Jersey, then drove southwest through Arkansas before heading north. Along the way, defendant placed an Ohio license plate on the car and registered under false names at motels. He never discussed why he had left California and when Costello asked, he did not want to talk about it. After seeing how anxious defendant became when police cars passed them, she concluded that he was running from the law.

On July 23, law enforcement officers stopped defendant's car in Deadwood, South Dakota after being advised he was in the region and wanted as a murder suspect. Defendant and Costello were both taken into custody and defendant was arrested for violating his parole. Police seized a Ruger .22-caliber semi-automatic rifle, a box containing 31 cartridges for a .22-caliber long rifle, and a magazine loaded with 10 rounds of .22-caliber ammunition.

### c) *Defendant's statements to law enforcement officers and videotaped reenactment of the crimes*

Over the following two days, Ontario Police Department Detectives Gregory Nottingham and Pat Ortiz interrogated defendant four times. Each interrogation was audiotaped or videotaped. On each occasion, the recording equipment was in plain view.

At their first meeting the morning of July 24, after approximately six minutes of preliminary introductions and questions, Detective Nottingham read defendant his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). After defendant confirmed that he understood these rights, Nottingham proceeded to ask defendant about

4

his relationships with Costello and Jamison, as well as about his military and employment background and his prior robbery arrest. In discussing these subjects, defendant recounted working for Michael Ray at a facility in Long Beach in 1979 and going to SOS in Ontario in early June 1992 to visit Eriksen and to look for a job.

Defendant then volunteered, "I know what you guys are getting at. . . . I also want you to know that the reason why I'm so calm is because I'm where I belong. . . . I know why you're here in my dreams and that's all." When asked to clarify, defendant replied, "You know as well as I do that I committed an armed robbery in Ontario" at "Mike's company." When asked for further clarification, defendant reiterated, "I committed an armed robbery," and asked, "Should I have somebody here talking for me, is this the way it's supposed to be done?" Detective Nottingham reread defendant his *Miranda* rights and asked if he understood them. Defendant stated, "I do understand."

In response to the detectives' subsequent questions, defendant gave an occasionally rambling account of his activities on June 27, describing how he chose to rob SOS, how the robbery, murders, and arson occurred, and his subsequent actions. He admitted entering SOS with the intention to steal money, binding the hands of the three victims with duct tape, returning to the bathroom to shoot them, and then using gasoline to set the building on fire. These confessions were interspersed with references to defendant's dreams, things he claimed to have done during his military service in Vietnam, and expressions of relief at being caught.

The detectives interrogated defendant two more times the afternoon of July 24, and again the following morning. No additional *Miranda* advisements were given. Defendant told the detectives he had altered two military personnel forms found in his car because he was looking for work and wanted to "look[] better" and "cover" for time when he had been incarcerated. He also indicated he had "ripped off a shipment" as a narcotics courier and asked at one point to be placed in protective custody. One of the

5

detectives also made references to the victims' families, stating that once lawyers got involved in a case, it would get "a lot more complicated."

Between July 27 and July 31, the detectives spoke with prosecutors working on the case and played the interview tapes for them. Because the quality of the tapes was poor, the prosecutors suggested a videotaped reenactment at the crime scene and told the detectives that the reenactment should be done before an arrest warrant was filed. On July 31, Wesley Lewis, a correctional sergeant at Folsom Prison where defendant was being held on his parole violation, interviewed defendant to determine whether he would be willing to participate in the reenactment. Defendant indicated that he would be "happy" to cooperate "if it would get me out of here any sooner or quicker."

On August 2, defendant conducted a reenactment of the crimes, which two detectives observed and videotaped. Defendant was advised of his *Miranda* rights before starting the reenactment, and affirmed that he understood these rights and wished to talk to law enforcement officers.

In the video, defendant described how on the day of the murders he first went to SOS shortly after noon and stayed for about a half-hour talking with the three victims. He then left and returned after 3:00 p.m. "to take all the money . . . so I could leave the state." He reentered SOS with the shortened .22-caliber rifle concealed in a paper bag. At gunpoint, defendant ordered the three victims to follow him through the hallway to the front lobby, where he forced Sonke to give him the money from the cash register.

When defendant asked Sonke where the rest of the money was, Sonke indicated it was in an office down the hall. Defendant made all the victims go with him to that location and Sonke opened a filing cabinet with some keys, but did not remove anything. Defendant took the keys and made the victims enter the women's bathroom, where he told them to lie down on the floor and be quiet. He left all three victims with their hands bound behind them with heavy duty tape he had purchased weeks before, but also claimed he had only planned the robbery earlier that day when he decided to return to

6

SOS. Defendant then took the money from the cash drawer in the filing cabinet, returned to the bathroom, and shot the three men.

Retrieving a can of gasoline from his car, defendant went back inside to set fire to the building. When he reentered the bathroom, Silva and Sonke were not moving but Smith was attempting to break loose of his bonds. Defendant shot Smith again, poured gasoline along the hallway, and ignited it with a match. He then removed a key from inside the front door and exited, locking the door from the outside. He drove to a freeway overpass to watch the building for a minute or so until a fire truck arrived.

### 2. The defense case

In his opening argument during the guilt phase, defense counsel described defendant's experiences in Vietnam, stating that because of posttraumatic stress disorder, there were periods in his life when defendant "lost time." With respect to the murders, counsel claimed these were not crimes defendant wanted to commit, and that the only way law enforcement officers were able to connect defendant to them was by virtue of defendant's cooperation. Counsel cross-examined prosecution witnesses, but presented no guilt phase witnesses or other evidence on defendant's behalf.

During closing argument, counsel contended defendant committed the charged offenses because he was experiencing a buildup of pressure caused by a mix of helplessness and fear. In conclusion, counsel argued, "from everything we know John Cunningham wished to take responsibility for this particular crime, and he did."

### B. The Penalty Phase

Defendant's requests to absent himself from the penalty phase were denied. A jury was selected and heard evidence for 34 court days over the course of five months. The prosecution presented testimony relating to the circumstances surrounding the crimes, the effect of the murders on those connected to the victims, and defendant's prior felony convictions. Defendant presented extensive testimony to document his abusive

7

childhood, his traumatic combat experiences in Vietnam, and the effects of posttraumatic stress disorder on Vietnam-era veterans. He also presented testimony that attempted to discredit some of the prior crimes evidence.

### 1. The prosecution's case in aggravation

#### a) *The circumstances surrounding the murders*

The prosecution presented the testimony of many of the same witnesses who testified during the preliminary hearing and the bench trial to demonstrate the circumstances surrounding the burglary, robberies, murders, and arson. Also presented were the videotapes and transcripts of defendant's July 1992 interviews and August 1992 reenactment and stipulations regarding the collection of crime scene evidence.

#### b) *Prior crimes*

On April 24, 1976, Herta Gill was a cashier at the Vineland Drive-In in the City of Industry, California, when at about 9:00 p.m., defendant robbed her at gunpoint of all the money in her register. He was apprehended a short time later while in possession of a firearm and the stolen cash. After pleading guilty to felony robbery and admitting to personally using a handgun, defendant was sentenced to one year in county jail and then placed on probation.

On April 5, 1982, Michelle I. was 14 years old and alone at her home in La Mirada, California, when defendant sexually assaulted her. Defendant, then a family friend, entered the home on the pretense his car had broken down, but after appearing to use the phone asked Michelle to give him a "blow job." When she refused, defendant forced her onto her knees. When she began screaming, defendant struck her in the face with a closed fist, threatened further physical violence if she continued to scream, and dragged her by the hair to the sofa, where he forced her to perform oral sex on him for approximately 10 minutes. Before leaving, defendant said he had killed his ex-wife and her lover and warned he would "come back" to do the same to Michelle if she told

8

anyone what had happened. Michelle nonetheless reported the incident to her family and the police and testified at the subsequent trial. Defendant was convicted of felony forcible oral copulation with a minor and sentenced to state prison.

In April 1987, Samira S. was 15 years old and living with her mother and younger sister in Paramount, California, when defendant, a family friend, moved in. Within two or three weeks, he began fondling and kissing Samira when they were alone. She would tell him to stop, but defendant would continue touching different parts of her body. Subsequently, defendant forced Samira to perform oral sex on him, slapping her when she did not perform to his satisfaction. Samira thereafter engaged in oral sex with defendant once or twice a week between April and September of 1987. If she resisted, defendant would get angry and slap her. Defendant repeatedly tried to convince Samira to have sexual intercourse with him but she refused. Nevertheless, he would put Vaseline or baby oil on his penis and partially penetrate her vagina. Defendant also asked to take naked photographs of Samira, but she refused. Sometimes defendant would give Samira money and buy her gifts. He also caused her to be truant from her summer school courses. In September or October of 1987, Samira told a friend from church and a school counselor about defendant's sexual assaults. He was convicted of two counts of oral copulation with a minor and sentenced to state prison.

### c) Victim impact evidence

The prosecution introduced the testimony of family members of the victims who testified about qualities of their loved one and how each learned about the murders. Jose Silva was the youngest of 10 children and was raised by his older sister Josefina after their mother died. He regularly attended family functions and had a one-year-old son at the time of his death. David Smith had been married to his wife Mimi for 10 years when he died and had a daughter named Tiffany. His half brother described Smith as someone who loved the outdoors and as "a very gentle soul." Wayne Sonke had five adult

9

children and five grandchildren at the time of his death. His daughter Lois Backe described being at her mother's house waiting for Sonke to return home from work when the fire department called asking for Sonke and saying that the alarms had gone off at SOS. After her father still had not returned or called home, Backe drove to SOS. A police officer on the scene told her there had been a triple homicide and asked Backe to describe her father. She later had to give the news of his murder to her youngest brother and mother.

### 2. The defense's case in mitigation

#### a) Family and social history

Ronald Forbush, a defense investigator, researched defendant's personal and social history and interviewed various relatives. Defendant's parents Vivian and Maurice Cunningham divorced when defendant was approximately two years old. Vivian had a prior marriage at age 14, two subsequent marriages, and apparently worked at some point as a prostitute. Maurice subsequently remarried as well. As a result, defendant had two older brothers, Sam and W.C., and several half siblings and stepbrothers and stepsisters. At the time of the trial, defendant's parents were deceased, and his brother Sam was in Huntsville State Prison in Texas.

Vivian's younger half sister Carolyn M. testified that Vivian was dishonest; at various times she had lied about a brother having died, about being in a car accident, and about her middle son (W.C.) having died. Carolyn also recounted one evening when she was in seventh grade and Vivian and Maurice were living in the same house as the rest of the family when Carolyn awoke to find Maurice sexually molesting her.

Defendant's brother W.C. testified their mother and father both had problems with alcohol. One time, when W.C. was under 10 years old, Vivian, intoxicated, called him into her bedroom and sexually fondled him. After he left, she called the other two brothers into the room one by one. Vivian's sexual abuse may have been recurring.

10

Maurice and Gene Collins, a stepfather, physically abused the boys. One time, after a violent confrontation with Collins in which Vivian stabbed him with a fork, she abandoned her three sons (then ages five, seven, and nine) for several weeks and they were forced to steal food to survive. Eventually, the boys were placed in an orphanage for approximately a year. Later they were flown to California to live with Maurice, his second wife Betty, and her children from a previous marriage. W.C. believed that his father sexually abused his stepsister, although Maurice never molested W.C. or, to the best of W.C.'s knowledge, defendant or their brother Sam.

One of defendant's stepbrothers testified that Maurice was a heavy drinker who often became violent with Betty and the children. Maurice also sexually molested the stepbrother so often he "couldn't count the times." Once when he was in seventh grade, the stepbrother told his mother Betty about the molestation. She cried but never did anything to stop it.

Diana Jamison, one of defendant's former girlfriends, testified she got the impression from defendant that his mother, Vivian, was very promiscuous when he was a young boy and had many different men coming in and out of her life. Defendant also alluded to having been sexually molested by his father, but would not discuss any details with Jamison.

Some of the sexual abuse detailed by the above witnesses was confirmed or alluded to by defendant in his interviews with Thomas Williams, one of the defense's penalty phase psychologists.

### b) *Military background*

After defendant graduated from high school, he enlisted in the United States Army. According to relevant military files and records, defendant was court-martialed various times for being absent without leave (AWOL) between May 1969 and March 1970. In May 1970, defendant was sent to Vietnam for approximately 11 months where

11

he was promoted three times, ultimately to sergeant. As a result of his service in the Vietnam War, defendant received several commendations.

While in Vietnam, defendant engaged in reconnaissance missions with units that would travel through the jungles for periods of five to 14 days scouting and securing areas believed to be infiltrated by the Viet Cong or North Vietnamese Army. The units set up claymore mines for mechanical ambushes and engaged in several firefights in which enemy troops or sympathizers were killed or captured. Defendant at one time operated in a "free fire zone," meaning that the soldiers had permission to kill any enemy combatants in that area. Sometimes a unit would happen upon empty enemy bunkers or mass enemy graves; other times it found "blood trails" left by the enemy dragging their wounded or dead soldiers away from combat scenes. If a unit encountered an enemy village in an uncontrolled area not authorized for settlement, standard operating procedure was to evacuate the people and set the buildings on fire. Once, defendant required medical attention due to heat exhaustion. Another time, he was hospitalized for a malaria infection.

Nineteen veterans who served in defendant's reconnaissance platoons testified about their daily activities and various missions in Vietnam. Some of the veterans who testified characterized defendant as a "good soldier" but also as a "loner" who generally kept to himself. Others did not specifically remember defendant. Three veterans, including one who allegedly knew defendant the best, for various reasons were unable to attend the trial and testify.

Many of the veterans who testified suffered from posttraumatic stress disorder (PTSD), flashbacks, depression, or other problems as a result of their service in Vietnam. These veterans explained they often had problems adjusting to life after Vietnam, and many of those adjustment problems remained with them throughout their lives. They had trouble sleeping, were regularly afflicted by nightmares, and experienced problems with anxiety, hypervigilance, and being easily startled by innocuous sounds (such as a car

12

backfire or a motorcycle) or simple sights (like a tree stump).  One witness compared the experience of suffering from PTSD to "carrying a demon around at times."  However, none had committed any felonies or crimes of violence after they returned home.

Cross-examination further revealed that other than the death of a medic from a mortar accident on base, there were no casualties or fatalities in any of defendant's platoons.  Defendant was never captured or tortured by the enemy, and none of his units ever destroyed a village in a manner that killed women and children.  Defendant did not participate in long-range reconnaissance patrols or Special Forces.  Although the reconnaissance platoons rarely took prisoners, on one occasion, defendant's unit took 30 to 50 prisoners, including women and children who were sympathetic to the enemy, but none of the prisoners were bound or mistreated in any way.

After Vietnam, defendant was stationed for the remainder of his three-year tour at Fort Hood, Texas, where he was court-martialed four different times for being AWOL.  Ultimately, he was demoted from his sergeant rank and honorably discharged as a private.

### c)  Psychological evidence concerning posttraumatic stress disorder

G. Robert Baker and Thomas Williams testified for the defense as experts on PTSD, among other topics.  Baker was a psychologist with the Department of Veterans Affairs and clinical coordinator for the National Center for Post-Traumatic Stress Disorder.  Williams was a psychologist who specialized in working with trauma victims and training individuals involved in treating veterans.  Both served in Vietnam in the Marines Corps.

Baker and Williams described PTSD as a reaction to unusual and frightful events outside the normal range of human experiences, such as those experienced in war zones.  The symptoms of PTSD include nightmares, intrusive and unwanted thoughts and images, flashbacks, avoidance and dissociative behaviors, depression, psychiatric

13

numbing, social isolation, disassociation from and distrust of others, anxiety, sleep disorders, anger management problems, hypervigilance, adrenalin- or sensation-seeking behaviors, memory impairment, and concentration difficulties. Although there is no cure for PTSD, the symptoms can be treated and individuals can be taught how to manage them.

Williams explained symptoms such as flashbacks or nightmares could happen at any time depending on the particular individual and his experiences. However, certain stimuli would be expected to trigger them. Military training in particular sensitized soldiers to various stimuli and caused them to react quickly to perceived danger. PTSD may also be retriggered by secondary traumatic experiences, or compounded by preceding ones. According to Baker, although soldiers suffering from PTSD might be expected to avoid events such as fireworks displays, which can trigger combat memories, they might still carry guns, which would likewise trigger combat memories, because guns were a source of protection. Recurrence of malaria symptoms also can act as a PTSD trigger, although malaria infections themselves, which were common in Vietnam, did not cause PTSD. Baker also explained the concept of "survivor guilt" and how soldiers who suffered from PTSD often exaggerated their combat roles.

Both experts explained how the Vietnam conflict presented unique difficulties for many reasons—most of the soldiers were very young, the war had no front lines, there were no clearly defined objectives other than killing people, it was often unclear who was the enemy, there were no safe areas in light of the guerrilla nature of the war, there was no winning strategy, the primary goal was survival, there was little unit cohesion because soldiers were constantly being replaced, the jungle environment made living conditions difficult, and neither the Vietnamese civilian population nor the American public appreciated the soldiers. These factors made it more difficult to treat Vietnam War veterans suffering from PTSD. In particular, the social isolation Vietnam veterans felt upon returning home prevented them from seeking treatment. In defendant's case, the

14

isolation was exacerbated because he did not have a loving and supportive family or religion to turn to upon his return. Present-day treatments for PTSD, moreover, were not available to veterans in the early 1970s, as the disorder was not well understood at that time.

Based on his review of defendant's records, Baker opined defendant was involved in the type of combat that could produce PTSD. However, he never met or evaluated defendant for PTSD. Baker explained how individuals are screened for PTSD and the importance of confirming the truthfulness of reported personal histories in rendering a diagnosis, as malingering—feigning the symptoms of a disorder—can apply to someone claiming to suffer from PTSD.

Williams positively diagnosed defendant as having PTSD. This diagnosis was based on his interviews of defendant for three days in May and June of 1995, and his review of the videotapes of defendant's interviews with the detectives and the reenactment, charts of the daily activities of defendant's Vietnam units, statements of family members and the veterans who served with defendant, and the penalty phase testimony of various witnesses. Williams did not, however, meet with any of the witnesses from the case.

In his interviews with Williams, defendant said when his mother abandoned him and his brothers, their electricity and water were turned off and they had to steal food to eat and use neighbors' swimming pools to bathe. Defendant further claimed he broke into other people's homes to observe what normal childhood and family life was like. He told Williams that he was isolated in the orphanage. He alluded to being sexually molested by his mother once, and told Williams that he was once sexually fondled by his father, had personally observed his father having sex with his half sister at least once, and "quite frequently" heard his stepbrother screaming as Maurice sodomized him. Although defendant refused to give details of the alleged molestation by his mother, saying "he was going to take that to his grave," Williams felt the brother's reported sexual abuse by

15

Vivian and the literature on sexual abuse—which stated generally all the children are sexually abused within a family that has sexual abuse—corroborated defendant's claim of abuse by his mother. Williams further noted that observing sexual abuse could cause PTSD.

Williams opined defendant's PTSD was caused by childhood neglect and sexual abuse, as well as combat experiences in Vietnam. Defendant most likely developed PTSD when he was about nine years old, and then was retraumatized in Vietnam, which contributed to his then-current PTSD. Although he believed defendant had PTSD when he robbed Gill and committed the sexual offenses against Michelle I. and Samira S., Williams could not say whether defendant was going through a dissociative episode when he committed those offenses. Williams conceded child molestation, robbery, and murder were not part of the diagnostic criteria for PTSD. Although Williams found defendant to have an "[i]nability to delay sexual gratification and generally poor sexual adjustment," he did not consider defendant a pedophile or sex addict.

Defendant told Williams he had always had an active "fantasy life," had difficulty at times distinguishing fantasy from reality, and relied on dreams for memory. When relating stories about Vietnam, defendant was not sure whether they really happened or not. Williams believed this was dissociative behavior indicative of PTSD. It was clear to Williams defendant's Vietnam service was very important to him, "a cornerstone in his life." Williams acknowledged defendant made inaccurate or untrue claims about his military background and Vietnam experiences during the police interviews. He also was aware defendant had altered a form regarding his military experience, listing training and awards he did not receive and operations in which he did not participate, and deleting references to his AWOLs. Williams agreed falsification of military records might indicate a "factitious" PTSD disorder or malingering, and it was also possible defendant's false Vietnam stories were unrelated to PTSD and only "embellishments of war stories."

16

Based on his review of autopsy photographs and defendant's statements to law enforcement officers, Williams opined defendant "dissociated" at some point during the SOS killings. As a result of this altered state of mind, although defendant knew robbery was wrong at the time, he did not "really internally believe[]" he had committed the murders until he participated in the reenactment. In support of this conclusion, Williams cited defendant's claim he felt like he was standing behind himself watching the crimes happen, his shooting the victims even though they were bound with tape and he already had the money, his viewing Smith as a threat when Smith broke his bonds, defendant's reference to "the LT" or lieutenant instructing soldiers "to always burn the village, never leave anyone behind, kill everyone," and the physical distress defendant manifested in the video reenactment of the crime. Although defendant did not refer to his dreams during the reenactment as he had done in the first interview, Williams still felt defendant was "drifting" during the reenactment. Williams also related some of defendant's behaviors to experiences defendant had had in Vietnam, such as arming himself with a gun, using duct tape, and shooting the victims in the head even if they might already have been dead. He conceded, however, a person who intentionally makes a decision to injure another or rob someone in order to take money would "probably" not be acting due to PTSD.

Defendant also took a self-administered and unsupervised test called the Dissociation Experiences Scale (DES). Based on the DES, Williams concluded defendant had a high level of dissociative experiences. Another self-administered and unsupervised test, the Minnesota Multiphasic Personality Inventory 2 (MMPI-2), indicated defendant was distrustful and moody, had poor social skills, and was not malingering. Two subscales within the MMPI-2 scored defendant positive for PTSD. However, defendant declined to answer five questions out of 568, which prompted the testing service to state "the pattern of his item omission should be carefully noted."

17

*d) Prior crimes*

Daniel and Olivia Negron knew Samira S. and her mother through church. While defendant was residing in Samira's home, the Negrons attended social functions during which Samira sat on defendant's lap and appeared to be "very flirtatious with" and "coming on" to him in an inappropriate manner.

Damarie H., Samira's aunt, stayed at Samira's home for approximately six months, during which time defendant was sleeping on the sofa. Damarie noticed Samira did not shy away from the attention she received from defendant. Concerned about their relationship, she asked Samira if "anything was going on" with defendant. Samira became defensive, saying her mother was "starting to get on her case about the same thing." Samira told her aunt defendant was "very nice" and she cared for him, and tried to imply there was something going on between defendant and her mother. According to Damarie, Samira was not always truthful. Although Samira bruised easily as a result of having lupus, Damarie did not recall seeing any bruises on her during the time defendant was staying with them.

Deputy Sheriff Pierre Nadeau interviewed Samira in October 1987. When asked about bruising around her eyes and swelling on the back of her head, Samira told Nadeau she had been injured fighting with her mother. When Deputy Sheriff Goran interviewed Samira, she never mentioned defendant had slapped her, but said she was afraid to say no to defendant because other men had previously slapped or beat her for refusing sex. When Dr. Kerry English examined Samira, she also did not tell him that defendant had slapped her. Although she indicated defendant had twice attempted to have sexual intercourse with her, she stated defendant stopped because it was painful for her.

### 3. The prosecution's rebuttal in aggravation

Detective Nottingham testified defendant told him during the Deadwood, South Dakota, interview that he had spent two years in Vietnam and served in the Special

18

Forces. Nottingham further explained how he found the original and altered forms relating to defendant's military record.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. Pretrial shackling

Defendant claims he was denied his state and federal constitutional rights to due process and a fair trial when he was "repeatedly and unnecessarily" restrained during pretrial proceedings without an adequate showing of manifest need and without employing less restrictive alternatives. He argues the shackling rendered his trial structurally unsound and resulted in prejudice. This claim is meritless.

##### a) *Background*

During the initial hearing on defendant's motion to suppress his statements to law enforcement officers, defense counsel objected to defendant's being shackled in the courtroom. The trial court ordered defendant's waist chains removed and his hands placed in regular handcuffs in front of his body. After counsel continued to object to the handcuffs, the prosecutor placed on the record various reasons justifying the shackling, including that defendant was being tried for three capital murders and had specialized military training. The court ultimately ruled the "limited restraints" would remain for purposes of the current proceedings.

At the next hearing, defense counsel objected to any shackling of defendant, indicating defendant would "waive all appearances if he has to go through this shackling business." The court stated it was willing to order defendant not be restrained in the courtroom and to be restrained only during transit in the public halls of the courthouse, a routine security measure in the San Bernardino courthouse not limited to defendant. The prosecutor concurred and the court ordered defendant "not be shackled in the courtroom."

19

Defendant subsequently filed a motion objecting to the use of restraints in the holding areas of the courthouse, where he might be kept for several hours before a court appearance, and further requesting the case be transferred back to the Rancho Cucamonga courthouse, where the preliminary hearing had been held and where in-transit shackling apparently was not required. The trial court ultimately ordered that defendant not be restrained in the holding facilities or the courtroom. However, it found the standard procedure of shackling prisoners during public transit between the holding cell and the courtroom to be a reasonable security precaution and denied without prejudice the request to transfer the case to Rancho Cucamonga.

Later, defendant appeared in court to personally waive his presence at that and all future pretrial hearings. Although his legs were shackled at the time, the court assured defendant the shackles would be removed in the courtroom if he chose to participate in the proceedings. After defendant waived his presence, counsel asked he not be transported to court again until the penalty phase jury trial or transfer of the case to Rancho Cucamonga.

The balance of pretrial proceedings as well as the guilt phase bench trial took place in San Bernardino. Thereafter, defendant filed a written request to have the penalty phase tried in Rancho Cucamonga with jurors from its West End Judicial District. The trial court denied the request in part, ordering that jury selection occur in San Bernardino but that the panel be drawn exclusively from the West End. Defendant was ordered to personally appear to address jury selection issues but his counsel objected, claiming that the court's promises concerning shackling had not been kept and again objecting to the in-transit shackling. The court overruled the objection, finding it had accommodated defendant throughout the proceedings. Subsequent pre-penalty-phase proceedings and the initial portion of jury selection (primarily hardship excusals and challenges for cause based on the juror questionnaires) took place in San Bernardino, but the remainder of jury

20

selection and the penalty phase trial took place in Rancho Cucamonga, after which there were no further shackling objections.

### b) Analysis

No defendant "may be subjected, before conviction, to any more restraint than is necessary for his [or her] detention to answer the charge." (§ 688.) However, an appellate court will not overturn a trial court's decision to restrain a defendant "absent 'a showing of a manifest abuse of discretion.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1050 (*Wallace*).)

The jurisprudence on shackling primarily concerns situations that might prejudice a jury. Such cases hold that under state law, in light of the potential harm to the constitutional presumption of innocence and right to be present and participate in one's defense, " '[a] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' " (*Wallace, supra,* 44 Cal.4th at p. 1050, quoting *People v. Duran* (1976) 16 Cal.3d 282, 290–291; see *People v. Harrington* (1871) 42 Cal. 165, 168–169; see also *Deck v. Missouri* (2005) 544 U.S. 622, 624.)

Defendant incorrectly assumes the propriety of shackling a defendant while in transit through the public hallways of a courthouse to attend a pretrial hearing, the factual scenario presented here, should be assessed under the same standards used to determine whether a defendant can be shackled while in the courtroom. Not so. The considerations of public safety and the need for restraints are different during prisoner transport than when a defendant is seated in a secured courtroom. We have long observed that a defendant may be restrained while in transit between a jail and the courtroom without reference to any particularized showing of need. (See, e.g., *People v. Ross* (1967) 67 Cal.2d 64, 72 ["It was a reasonable practice for the sheriff to keep prisoners handcuffed while in transit, and the fact that the handcuffs were removed inside the courtroom rather

21

than outside added to the security."]; *People v. Metzger* (1904) 143 Cal. 447, 449 ["In many cases it is proper, and it is often necessary as a precaution, to manacle a prisoner to secure his safe conduct and guard against an escape while on the way from the jail to the courtroom."]); see also *People v. Hardy* (1992) 2 Cal.4th 86, 180; accord, *People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1140–1141; *People v. Du Bose* (1970) 10 Cal.App.3d 544, 549–550; *U. S. v. Leach* (8th Cir. 1970) 429 F.2d 956, 962.].)

Accordingly, we see no abuse of discretion in the use of physical restraints during defendant's transit through the public hallways of the San Bernardino courthouse without any particularized showing of need. The shackling was a reasonable and limited precaution taken to retain custody of an accused and was no more restraint than was necessary for his detention. The in-transit physical restraints in no way affected the conduct or outcome of the trial, whether before judge or jury, nor did they impinge upon the presumption of innocence or defendant's right to present a defense.

In his reply, defendant argues that given the necessity of shackling him for transport through the halls to his courtroom in San Bernardino, "the unreasonable burden placed on this defendant should have been ameliorated by moving the proceeding to a different courtroom or to Rancho Cucamonga." He cites no authority to support this proposition, nor are we aware of any. As noted, defendant's shackling for security during transport was a limited and reasonable imposition. The trial court was not required to move the proceedings to a different courtroom or to the Rancho Cucamonga courthouse simply to obviate this precaution.

### 2. Waiver of the right to be present at pretrial and guilt phase proceedings

Defendant claims the trial court violated his state and federal constitutional rights to due process and a fair trial when it excused him from numerous pretrial proceedings and the guilt phase of his trial based on a waiver of his personal presence that allegedly was coerced by "painful, excessive, and unnecessary shackling." He additionally

contends the trial court violated sections 977 and 1043 by accepting involuntary waivers of his right to be personally present at the guilt phase of his capital murder trial without adequate justification.

### a) Constitutional right to be present

"Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' [Citations.] Due process guarantees the right to be present at any 'stage . . . that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.' " (*People v. Butler* (2009) 46 Cal.4th 847, 861.) The state constitutional right to be present at trial, which is guaranteed by article I of the California Constitution, " 'is generally coextensive with the federal due process right.' " (*Butler*, at p. 861.) As a matter of both federal and state constitutional law, however, a defendant may validly waive his or her right to be present during a critical stage of the trial, provided the waiver is knowing, intelligent, and voluntary. (*People v. Moon* (2005) 37 Cal.4th 1, 20–21 (*Moon*); *People v. Jackson* (1996) 13 Cal.4th 1164, 1210 (*Jackson*).)

Defendant premises his challenge to the voluntariness of his right to be present waivers entirely on the argument that the waivers were induced and coerced by improper shackling. He contends he was forced to waive his presence "simply because he could not endure the effects of the wrist, waist and leg chains *every day for more than eight hours a day*." (Italics added.) The record demonstrates, however, that the trial court relieved defendant of all physical restraints in the courtroom and holding cell prior to any evidentiary hearings or critical phases of the postarraignment proceedings. Thereafter, defendant remained subjected to physical restraints only for the time it took to transport him to and from the holding cell and the courtroom. Having concluded that this limited in-transit shackling was not an abuse of the trial court's discretion, we further conclude

23

the use of restraints in transit did not improperly coerce defendant to waive his presence at the pretrial and guilt phase proceedings, particularly as the court permitted him to remain completely unrestrained in the courtroom.

An analogous situation was presented in *People v. Price* (1991) 1 Cal.4th 324 (*Price*). After a hearing outside the presence of the jury during which the evidence established the defendant had committed multiple acts and threats of violence against officers at the jail or while being transported to court, the court ordered he be secured to his chair in the courtroom by a single belly chain not visible to the jury. The defendant then stated "he would rather be absent from the trial than appear before the jury in chains. The trial court allowed defendant to leave the courtroom and return to the jail, after informing defendant that his leaving would be construed as a voluntary waiver of presence. After giving the matter further thought, the court directed jail officers to bring defendant back to the courtroom, but defendant refused to dress in civilian clothing for the court appearance. The court then concluded that defendant had effectively waived his presence. The remainder of the guilt phase proceeded in his absence." (*Id.* at pp. 404–405.)

On appeal, we found "no constitutional infirmity in the trial court's decisions . . . to accept defendant's actions as a voluntary waiver and to proceed with the guilt phase in defendant's absence." (*Price, supra*, 1 Cal.4th at p. 405.) Similarly here, we find no constitutional infirmity in defendant's waivers of his right to be present at pretrial proceedings and the guilt phase, even assuming such waivers were motivated in part by concerns about the in-transit shackling that would have accompanied his appearing in court.

### b) *Statutory right to be present*

The issue of statutory error is another matter. As we have previously acknowledged, "defendant's statutory ability to waive his presence in a capital case is

24

more circumscribed than the associated ability to waive his constitutional right." (*People v. Rundle* (2008) 43 Cal.4th 76, 135 (*Rundle*); see also *Jackson, supra*, 13 Cal.4th at p. 1211.) Specifically, section 977 requires any defendant charged with a felony to "be personally present at the arraignment, at the time of plea, during the preliminary hearing, *during those portions of the trial when evidence is taken before the trier of fact*, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present, as provided by paragraph (2)." (§ 977, subd. (b)(1), italics added.) Section 1043 provides that a felony defendant "shall be personally present at the trial" (*id.*, subd. (a)), but that the trial may continue in a defendant's absence if the defendant (1) persists in disruptive behavior after being warned (*id.*, subd. (b)(1)); (2) is voluntarily absent in "[a]ny prosecution for an offense *which is not punishable by death*" (*id.*, subd. (b)(2), italics added); or (3) has waived his rights "in accordance with Section 977" (*id.*, subd. (d)). Read together, the statutes provide that a capital defendant cannot voluntarily waive his right to be present during the proceedings listed in section 977, including those portions of the trial in which evidence is taken, and he may not be removed from the courtroom pursuant to section 1043 unless he has been disruptive or threatens to be disruptive.

Defendant correctly contends his absence during the guilt phase violated sections 977 and 1043. However, assuming defendant has not forfeited his claim of statutory error by failing to raise it below (see *Rundle, supra,* 43 Cal.4th at p. 135), the error does not warrant reversal of the judgment because it is not reasonably probable the result of the trial would have been more favorable to defendant absent the error. (See *People v. Weaver* (2001) 26 Cal.4th 876, 968.) Defendant fails to explain how he could have effectively assisted counsel in subjecting the prosecution's case to meaningful adversarial testing. We therefore conclude the violations of sections 977 and 1043 were harmless. (See, e.g., *Moon, supra,* 37 Cal.4th at p. 21.)

Relying upon *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346, defendant also contends the statutory violation deprived him of his federal constitutional procedural due process rights because the "arbitrary" violation of section 977 and section 1043 allegedly deprived him of a state-created "liberty interest" in the proper application of state law. We have previously rejected this exact argument. (See *Rundle, supra,* 43 Cal.4th at p. 136.)

### 3. Waiver of the right to a guilt phase jury

Defendant claims the "wanton infliction of pain" caused by the daily courthouse shackling not only coerced a waiver of his right to be present at the guilt phase, but also resulted in the involuntary waiver of his right to a jury trial at the guilt phase in order to avoid the alleged "embarrassment and prejudice" attendant to being tried by a jury while he was not present. He argues the failure to obtain a knowing and intelligent waiver of his right to a jury trial violated his state and federal constitutional right to due process and requires the reversal of his conviction. As with his claim concerning the waiver of his right to be present, this claim is without merit.

At a pretrial status conference, the prosecutor informed the court he had discussed with defense counsel the possibility of having a bench trial for the guilt phase. Defense counsel confirmed, stating "I am inclined to agree to recommend to my client that if he's agreeable, then we're agreeable to a court trial on the guilt phase[, although w]e would still want a jury trial in the penalty phase." At the next status conference, defense counsel confirmed defendant had filed a written waiver of his right to a jury trial of the guilt phase, stating, "[W]e don't wish to have a jury decide [the issue of defendant's guilt or innocence,] just the court." The court indicated a personal appearance by defendant was required for the waiver to be effective.

Defendant subsequently appeared in person via closed-circuit television to waive his right to a guilt phase jury trial. In response to questioning by the court, defendant

indicated he understood (1) he had an absolute right to a jury trial in both the guilt and penalty phases of his trial, (2) in a jury trial, if one of the 12 jurors was not convinced beyond a reasonable doubt that defendant was guilty, the jury could not return a guilty verdict, (3) if he waived his right to a jury trial, instead of 12 people deciding the issue of his guilt or innocence, the judge alone would make that decision, and (4) it could be easier for the prosecution to convince only one person, as opposed to 12, that defendant was guilty beyond a reasonable doubt. Defendant nevertheless stated he wished to waive his right to a jury trial for the guilt phase, confirming he had discussed the issue with his counsel, who concurred in the waiver.

As relevant here, the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ." (See also Cal. Const., art. I, § 16 ("Trial by jury is an inviolate right and shall be secured to all . . . ."].) Although trial by jury is a fundamental constitutional right, a criminal defendant may waive the right. (See *Adams v. United States* (1942) 317 U.S. 269, 275; see also Cal. Const., art. I, § 16.) However, "[a]s with the waiver . . . of several other constitutional rights . . . long . . . recognized as fundamental, [in order to be valid] a defendant's waiver of the right to jury trial must be knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' " ' as well as voluntary, ' " 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305.)

The conclusion defendant's waiver of a guilt phase jury was knowing, intelligent, and voluntary is supported by his clear express waiver, made in open court, with counsel's consent and agreement, and after a full explanation from the court of the right and the consequences of the waiver. Conversely, the record does not support defendant's contention that his waiver was induced by the "inhumane courtroom restraints in the San

27

Bernardino County Courthouse." Having been relieved of all physical restraints in the courtroom and holding cell well before the guilt phase commenced, defendant would have been restrained during the trial only for the time it took to transport him to and from the holding cell and the courtroom. Having concluded this limited in-transit shackling was not an abuse of the trial court's discretion and did not improperly coerce defendant to waive his right to be present, we further conclude it did not improperly coerce defendant's waiver of his right to a jury trial for the guilt phase, particularly as he was permitted to remain completely unrestrained while in the courtroom.

### 4. The guilt phase bench trial as tantamount to a "slow plea of guilty"

Defendant claims defense counsel failed to mount a defense at the guilt phase—presenting no affirmative witnesses, evidence, or defenses and conceding defendant's guilt on all the charges—and contends this failure was the "functional equivalent of a slow plea of guilty" that denied defendant his state and federal constitutional rights to enter a knowing and voluntary guilty plea following a full advisement of rights and express waiver of those rights. Respondent argues that defendant forfeited this claim by repeatedly rejecting the trial court's offers to set aside the guilt phase verdict and grant him a new guilt phase trial with or without a jury, or, in the alternative, that defendant is barred from raising it under the doctrine of invited error. We need not decide the forfeiture and invited error issues, however, because even assuming the claim has not been forfeited and is not barred, it lacks merit.

In *In re Mosley* (1970) 1 Cal.3d 913, we stated that if a defendant's stipulation to submit a case for decision on the basis of the transcripts of the preliminary hearing is, in the circumstances of the particular case, "tantamount to a plea of guilty," it must be accompanied by *Boykin-Tahl* advice and waivers, that is, the advisement and express personal waiver of three specific constitutional rights—the rights to a jury trial, to confront and cross-examine witnesses, and against self-incrimination. (*Mosley,* at p. 924;

28

*id.* at p. 925 & p. 926, fn. 10; see *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122.)  The phrase " 'tantamount to a plea of guilty' " was used "to explain [the] extension of the *Boykin-Tahl* requirements to submissions in which the guilt of the defendant was apparent on the basis of the evidence presented at the preliminary hearing and in which conviction was a foregone conclusion if no defense was offered." (*Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 602 (*Bunnell*).)[2]  We have further suggested that "a 'slow plea' of guilty" may occur where a defendant submits the issue of his or her guilt of the charged offense on the basis of the police report (*In re Jennings* (2004) 34 Cal.4th 254, 265, fn. 5) or "other documentation" (*People v. Watson* (2007) 42 Cal.4th 822, 826, fn. 3), or where a defendant in a capital case submits the issue of penalty on the transcript of prior proceedings (*People v. Robertson* (1989) 48 Cal.3d 18, 39 (*Robertson*)).

In *Robertson*, we explained that "submission" within the meaning of the slow plea doctrine "is defined by the rights a defendant surrenders."  (*Robertson, supra,* 48 Cal.3d at p. 40.)  "Although the parties may reserve the right to present additional evidence, the essential components of a submission are waiver of a jury trial and, with respect to the witnesses who testified in the prior proceedings, waiver of the right to confrontation in the present proceeding.  [Citations.]  When the submission is a 'slow plea' or 'tantamount to a plea of guilty,' the defendant also gives up his privilege against self-incrimination." (*Ibid.*; see *Wright, supra,* 43 Cal.3d at p. 495 ["If the submission does not amount to a slow plea of guilty, there is no involuntary confession of guilt."].)

Defendant's stipulation to a bench trial for the guilt phase in this case was not tantamount to a plea of guilty.  (See *Robertson, supra,* 48 Cal.3d at p. 40; *People v.*

---

**2**       In *Bunnell*, as a matter of judicial policy we mandated *Boykin-Tahl* advisements and waivers in all cases submitted for decision on the basis of the transcript of the preliminary hearing.  (*Bunnell, supra*, 13 Cal.3d at p. 605.)  But unless the submission was tantamount to a plea of guilty, a *Bunnell* error requires reversal only if the error was prejudicial to the defendant.  (*People v. Wright* (1987) 43 Cal.3d 487, 494–495 (*Wright*).)

*Hendricks* (1987) 43 Cal.3d 584, 592–594; *Wright, supra,* 43 Cal.3d at p. 497.)  Although in agreeing to the stipulation defendant gave up his right to a jury trial, he was advised of and personally waived this right.  In so stipulating he did not give up the right to confrontation and cross-examination or to remain silent.  To the contrary, defendant enjoyed a full court trial during which he confronted, cross-examined, and attempted to impeach the prosecution witnesses, and exercised his right against self-incrimination by not taking the witness stand.  Having fully exercised these rights, there was no need for defendant to waive them.  Additionally, defense counsel conceded neither guilt nor the necessary elements of the various offenses, but rather required the prosecution to prove every element of every crime through the testimony of 16 witnesses and attempted to raise reasonable doubt in various areas.  As counsel stated in closing argument, although defendant may have wished to take responsibility for the crimes, "failing a settlement that I can live with, as a lawyer *I must contest the charges.*"

### 5. The admission of defendant's statements to law enforcement officers and his videotaped reenactment

Defendant claims the trial court erred in admitting in both the guilt and penalty phases of the trial the contents of his custodial interrogations and his videotaped reenactment at the SOS store, in violation of his state and federal constitutional rights to due process, to be free from self-incrimination, and to be subjected to custodial interrogation only with the assistance of counsel.  According to defendant, law enforcement officers deliberately violated *Miranda, supra,* 384 U.S. 436, ignored an unambiguous request for counsel, and used a variety of coercive tactics that, when considered in their totality, demonstrate his statements were involuntary.  He argues that as a result, the incriminating statements were the product of repeated and intentional violations of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution, and that the allegedly erroneous admission of the confessions was prejudicial.

30

As discussed below, we conclude defendant understood the *Miranda* warnings he was given, validly waived his Fifth Amendment rights to remain silent and to an attorney, and made uncoerced statements to law enforcement officers. We therefore reject defendant's arguments regarding his taped statements and the video reenactment.

### a) Background

The prosecution first sought to introduce defendant's various interviews and the video reenactment during the preliminary hearing. Defense counsel objected. At a hearing on the issue, a magistrate judge found the detectives did not violate *Miranda, supra,* 384 U.S. 436, did not make any false statements inducing the confessions, and did not improperly fail to clarify a request for counsel. The judge further concluded defendant was properly advised of and knew his rights, and the statements and the video reenactment were made freely and voluntarily.

Before the guilt phase, defense counsel moved to suppress the custodial statements, any resulting admissions, and the video reenactment. The trial court held an evidentiary hearing at which evidence was presented concerning defendant's previous interrogations by law enforcement officers in April 1982 and January 1988 in connection with charges of oral copulation with Michelle I. and child molestation of Samira S., respectively. In each instance, defendant was advised of his *Miranda* rights and asked if he understood them, whether he wanted to talk about the case, and whether he wanted a lawyer; in each instance defendant agreed to talk to the officers without a lawyer and either wrote down his responses to the waiver questions or signed a waiver statement.

Ontario Police Department detectives testified about an exchange that occurred during the preliminary six minutes of their initial meeting with defendant in Deadwood, South Dakota before they gave him the first *Miranda* warning. After introductions and general questions about defendant's welfare, defendant asked detectives whether his girlfriend, Costello, was in jail. Detective Ortiz responded, "She's in our custody. She's

31

safeguarded."**3**  When defendant claimed that Costello was "not involved in any of this" and "shouldn't be in custody," the detectives responded, "[T]hat's what we need to find out from you. . . .  And this is your opportunity, okay . . . .  We both have [the] suspicion . . . that . . . she didn't have nothing [*sic*] to do with anything that happened before . . . you started running.  But basically we wanted to find out from you."  They also related arriving at Folsom Prison to transport defendant to the video reenactment.  The trial court additionally considered the preliminary hearing testimony of three law enforcement officers who were involved in the traffic stop and arrest of defendant.

Finally, several police officers testified concerning the department's practice at the time of defendant's interrogations of deliberately omitting the "express waiver" question from Ontario Police Department form 4.17, from which *Miranda* advisements were read. That question asked whether, having the *Miranda* rights in mind, the suspect wished to talk to about the case.  The practice of omitting this question was based on police training, information gleaned from prosecutors, and confirmation from the courts indicating such waiver was unnecessary.  In October 1992, after defendant was interrogated, the San Bernardino County District Attorney's Office issued a memorandum advising the department to ask the express waiver question in their interrogations.

With respect to the motion to suppress, the trial court found the detectives' comments during the first six minutes of the initial Deadwood interview, prior to giving a *Miranda* admonition about Costello being "in custody" and "safeguarded," to which defendant responded by protesting Costello's innocence, constituted psychological inducement or "softening up" likely to evoke incriminating statements.  Therefore, defendant's responses during that time had been obtained in violation of *Miranda*.  As to his later statements after the first *Miranda* admonition, the court found by a

_____

**3**      It appears that Costello in fact was staying at a hotel with a law enforcement matron.

preponderance of the evidence under the totality of the circumstances that defendant understood his constitutional rights, and his implied waiver of those rights "was voluntary and was a result of his own desire to make statements" and not the product of the prior improper influences. The trial court also found that: (1) defendant's incriminating statements were not induced by improper police conduct; (2) there was no bad faith intent to violate his *Miranda* rights, as the detectives had a good faith belief that the practice of not obtaining an express waiver was lawful; (3) defendant's ambiguous comment about having "someone here to talk for me" did not constitute an invocation of the right to counsel; and (4) no further *Miranda* advisements were required for the second, third and fourth Deadwood interviews because their purpose was merely to briefly clarify matters covered in the first interrogation.

With respect to the video reenactment, the court found (1) Sergeant Lewis's inquiry at Folsom Prison concerning whether defendant was willing to cooperate with authorities in an "ongoing investigation of a murder in a warehouse" was not a custodial interrogation requiring a *Miranda* warning, and nothing Lewis said or did improperly induced defendant's agreement to cooperate; (2) later, more specific questioning by the detectives who went to the prison to retrieve defendant for the reenactment was improper because an affirmative answer to the question whether defendant remained willing "to reenact the crimes," in and of itself, would be incriminating, but this one question did not influence defendant's previous agreement to cooperate; and (3) the reenactment was validly conducted after a full *Miranda* advisement with an express waiver.

Consequently, the court ruled defendant's multiple statements and confessions were admissible in the prosecution's case-in-chief during both the guilt and penalty phases of the trial, with the exception of the first six minutes of the initial interview and the in-prison questioning of defendant specifically about reenacting the crimes.

33

*b) Analysis*

Defendant advances various arguments in support of the proposition the trial court erred in failing to suppress his statements to law enforcement officers and the video reenactment as obtained in contravention of his constitutional right against compelled self-incrimination. None of these arguments are persuasive.

*(1) Alleged deliberate violation of* Miranda

Defendant argues his custodial statements should have been suppressed because they were obtained after a deliberate violation of *Miranda, supra,* 384 U.S. 436. This deliberate violation allegedly occurred when, during the first interview, Detectives Nottingham and Ortiz intentionally declined to seek an express waiver of defendant's right to silence after giving the *Miranda* advisement.

In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them. (*Colorado v. Spring* (1987) 479 U.S. 564, 574.) Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview. (See *North Carolina v. Butler* (1979) 441 U.S. 369, 373 (*Butler*) ["An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."].) Rather, a valid waiver of *Miranda* rights may, as here, be inferred from the defendant's words and actions. (*Butler*, at p. 373.) As the detectives who interrogated defendant were not required to obtain an express waiver of the right to silence from him, the intentional failure to do so was not a deliberate *Miranda* violation requiring the suppression of his subsequent statements.

*(2) Alleged coercion of defendant's custodial statements*

Alternatively, defendant contends his incriminating custodial statements were involuntary in light of a combination of other factors, including his compromised mental

34

state, the detectives' use of deception, and their implied promise to help his companion, Costello.

The test for the voluntariness of a custodial statement is whether the statement is " 'the product of an essentially free and unconstrained choice' " or whether the defendant's " 'will has been overborne and his capacity for self-determination critically impaired' " by coercion.  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 225.)  No single factor is dispositive; "rather courts consider the totality of [the] circumstances." (*People v. Williams* (1997) 16 Cal.4th 635, 661 (*Williams*); see *People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*).)  Relevant considerations include " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' "  (*Williams*, at p. 660; see *Neal*, at p. 84 [appellate review entails " 'inquiry into all the circumstances,' including 'evaluation of [defendant's] age, experience, education, background, and intelligence' "].)

"In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*People v. Smith* (2007) 40 Cal.4th 483, 501; see, e.g., *People v. Kendrick* (1961) 56 Cal.2d 71, 84 (*Kendrick*) ["a confession has been held involuntary and inadmissible where it was obtained as a result of . . . such inducements as a promise to do for an accused all that could be done [citation] or to protect the accused's family from retaliation [citation] or a statement that if the accused confessed the punishment would be lighter [citation] or that it would be better for him to confess [citation] or by threats to hold the accused's mother"].)

Additionally, although coercive police conduct is a necessary predicate, such conduct does not compel a finding that the resulting statement is involuntary.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 814 (*Jablonski*).)  A confession is involuntary only if

the coercive police conduct at issue and the defendant's statement are causally related. (*Colorado v. Connelly* (1986) 479 U.S. 157, 164, fn. 2, & 167; *Jablonski*, at p. 814 [The police misconduct " 'must be . . . the "proximate cause" of the statement in question, and not merely a cause in fact.' "]; see, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1095–1096 [the defendant's statements were not coerced by false threats of arrest; the sole cause appearing in the record for his cooperation during the interview was the desire to exculpate himself]; *Williams, supra,* 16 Cal.4th at p. 661 [promises of leniency were "not the motivating cause of [the] defendant's admissions"].)

Here, even assuming, as the trial court found, the detectives engaged in improper "softening up" at the outset of the first interview by claiming defendant's companion, Costello, was in custody and implying defendant could exonerate her by speaking to them, the totality of the circumstances of the interrogation support the conclusion defendant's statements given after he was later advised of his *Miranda* rights were voluntary and not the product of psychological inducement. The detectives' comments concerning Costello were relatively brief, lasting only three-to-four minutes of the preliminary six minutes of the interview and fell "far short of a threat to arrest" Costello unless defendant confessed. (*Kendrick, supra*, 56 Cal.2d at p. 86.) Importantly, the comments were immediately followed by the first of two *Miranda* advisements given to defendant, following both of which defendant stated unequivocally he understood the rights read to him and continued to talk to the detectives and to answer their questions. (Cf. *People v. Honeycutt* (1977) 20 Cal.3d 150, 158, 160 [a half-hour of "clever softening-up, . . . disparagement of the victim and ingratiating conversation" induced the defendant to agree to talk about the homicide *well before* being advised of his *Miranda* rights].)

During the interview, defendant indicated several times that, for various personal reasons, he had decided beforehand to talk to the detectives about the case. Defendant's pre-interview decision is the sole reason appearing in the record for his cooperation. It

thus does not appear the detectives' alleged attempts at softening up defendant overcame his will to resist or his ability to freely determine whether he wanted to talk to the detectives, such that it could be said the short discussion regarding Costello was the proximate cause of defendant's later incriminating statements.

We further note neither the length nor physical circumstances of the interrogation appear to have been coercive; the initial interview was spread over a four-hour period with the detectives offering defendant both food and drink. Nor was the tone of the questioning as evidenced in the transcript particularly harsh or accusatory.

Additionally, at the time of the interview, defendant was "a man of mature years with an extensive criminal history." (*Jablonski, supra,* 37 Cal.4th at p. 815.) In his 42 years, he had had extensive prior contacts with law enforcement and the criminal justice system, including having served two prior prison terms and one prior county jail term. In connection with his felony convictions, defendant twice had been interviewed by law enforcement officers, during which he was advised of and executed express written waivers of his *Miranda* rights.

Finally, with respect to defendant's mental state, it does not appear the detectives exploited any psychiatric problems in order to produce the incriminating statements. Before interviewing him, the detectives inquired about defendant's general welfare and mental state, and in response he expressed no concerns regarding his well-being or treatment, stating he had slept 24 hours straight.

Defendant nevertheless argues his soft-spoken nature, various references to dreams and experiences in the Vietnam War, and "consistently vague" responses demonstrate his fragile mental state during the interview. We disagree. A fair assessment of the interview in its entirety shows defendant responded to the detectives' inquiries while exhibiting normal emotions to be expected of a murder suspect facing his accusers and reliving the details of a horrible crime. That a murder suspect is soft-spoken is less an indication of mental illness than an understandable and expected reaction of a

person confronted with committing such horrendous crimes. Nor does the circumstance defendant may have dreamed about the homicides and their likely ramifications necessarily show the existence of mental defect. Although he became emotional at times, defendant also took considerable time to weigh his responses before answering the detectives' questions. Some answers may have required clarification, but they were generally responsive. We note the detectives believed the references to Vietnam were defendant's attempt to build a defense.

Lastly, defendant's incriminating statements were not rendered involuntary by any mental disease or defect. Even if some of defendant's behavior was irrational or bizarre, there is no evidence his "abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice." (*In re Cameron* (1968) 68 Cal.2d 487, 498; see, e.g., *People v. Frye* (1998) 18 Cal.4th 894, 988 (*Frye*) [defendant's consumption of alcohol did not so impair his reasoning that "he was incapable of freely and rationally choosing to waive his rights and speak with the officers"]; *People v. Mayfield* (1993) 5 Cal.4th 142, 204 [defendant, who throughout the lengthy interview sounded lucid, spoke clearly if somewhat slowly, and at times "engaged in animated, jocular, prideful, indignant or defiant conversation" with the detectives, was not mentally impaired when he made his audiotaped statement].)

### (3) Failure to terminate the interrogation after defendant allegedly invoked his right to counsel

Defendant contends his incriminating statements should have been suppressed because detectives ignored an unambiguous request for an attorney. He claims he invoked his right to counsel during the first interview when he stated, "I committed an armed robbery yes. Should I have somebody here talking for me, is this the way it's supposed to be?" We conclude defendant's vague question did not qualify as an unequivocal invocation of the right to counsel requiring the cessation of questioning.

38

Once a defendant has waived his or her right to counsel, as defendant impliedly did at the outset of the interview, if that defendant has a change of heart and subsequently invokes the right to counsel during questioning, officers must cease interrogation unless the defendant's counsel is present or the defendant initiates further exchanges, communications, or conversations.  (See *Edwards v. Arizona* (1981) 451 U.S. 477, 484–485.)  For a statement to qualify as an invocation of the right to an attorney, however, the defendant "must unambiguously request counsel. . . .  [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  (*Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).)  "[A] reviewing court—like the trial court in the first instance—must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant."  (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 (*Gonzalez*); see *People v. Williams* (2010) 49 Cal.4th 405, 428 ["[T]he question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the invocation—what would a *listener* understand to be the defendant's meaning."].)

Here, before the disputed exchange, defendant volunteered, "I know what you guys are getting at. . . .  I also want you to know that the reason why I'm so calm is because I'm where I belong."  When asked to clarify what he meant, defendant replied, "You know as well as I do that I committed an armed robbery in Ontario" at "Mike's company."  When Detective Ortiz indicated he wanted additional clarification, defendant reiterated, "I committed an armed robbery yes," and then asked, "Should I have somebody here talking for me, is this the way it's supposed to be?"  Far from unambiguously requesting counsel, defendant appeared to be expressing frustration at the

39

detectives' attempts to clarify his initial statements regarding the armed robbery. At most, a reasonable officer could have understood defendant's inquiry as an indication he *might* want an attorney, in which case the detectives still would not have been required to terminate the interrogation. (See *Davis*, *supra,* 512 U.S. at p. 459 ["[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."].)

Defendant complains the detectives should have asked questions to clarify whether he was invoking his right to counsel. There is no requirement law enforcement officers interrupt an interrogation to ask clarifying questions following a suspect's ambiguous or equivocal responses that might or might not be construed as an invocation of the right to an attorney. (*Davis*, *supra,* 512 U.S. at pp. 461–462; see *People v. Farnam* (2002) 28 Cal.4th 107, 181.) We again note defendant had extensive prior contacts with the police, including two interviews in which he expressly waived his right to counsel. The detectives in this case "could reasonably have assumed that defendant was capable of making an unequivocal request for counsel if he so desired." (*Gonzalez, supra,* 34 Cal.4th at p. 1127.) Moreover, after defendant's question and before the resumption of questioning, defendant was again advised of his *Miranda* rights, expressly stated he understood them, and continued to talk to the detectives rather than invoke his right to counsel or to silence. Later in the interview, defendant specifically confirmed the intent to waive his right to counsel when he stated he did not want to fight the case, did not need a lawyer, did not "believe in the routine of lawyers, or courts and all that," and did not feel a lawyer could do anything for him.

Considering the totality of the circumstances, "[s]hould I have somebody here talking for me" was not an unambiguous request for counsel requiring detectives to cease interrogating defendant. (See, e.g., *Gonzalez, supra,* 34 Cal.4th at p. 1126 [defendant's conditional statement that he wanted a lawyer "*if* he was going to be *charged*" was not an

40

invocation of right to counsel]; *People v. Crittenden* (1994) 9 Cal.4th 83, 124, 128–131 (*Crittenden*) [defendant's query—" 'Did you say I could have a lawyer?' "—was a clarification of rights rather than an unambiguous invocation]; *People v. Johnson* (1993) 6 Cal.4th 1, 27 [defendant's statements that " 'Maybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder' " and that his mother would secure " 'a high price[d]' lawyer" was not an invocation].)

*(4) Failure to suppress the videotaped reenactment*

Finally, defendant raises various additional challenges to the admission of the videotaped reenactment of the crimes. First, relying on *People v. Bonillas* (1989) 48 Cal.3d 757, and *People v. Thompson* (1980) 27 Cal.3d 303, defendant claims the reenactment should have been suppressed because the detectives took advantage of a postarrest delay in his arraignment, suggesting had his arraignment not been delayed, counsel would have been appointed and likely would have advised defendant not to participate in the reenactment. *Bonillas* and *Thompson*, however, involved defendants who had been arrested for the crimes that later formed the basis for their arraignments. (See *Bonillas*, at p. 787; *Thompson*, at p. 328.) In this case, defendant was arrested in South Dakota and returned to Folsom Prison for a parole violation unrelated to the SOS crimes. No arrest warrant for the SOS homicides had issued before the reenactment. Accordingly, *Bonillas* and *Thompson* are inapposite.

In the alternative, defendant argues his Sixth Amendment right to counsel attached when he became the focus of the SOS investigation and the delay violated his right to counsel regardless of the fact he was arrested and confined for a parole violation. However, "[a] criminal defendant's right to the assistance of counsel under the Sixth Amendment does not exist until the state initiates adversary judicial criminal proceedings, such as by formal charge or indictment." (*People v. DePriest* (2007) 42 Cal.4th 1, 33 (*DePriest*); see *Frye, supra,* 18 Cal.4th at p. 987; see also *People v.*

41

*Huggins* (2006) 38 Cal.4th 175, 244–245.)  Moreover, the "right to counsel is 'offense specific' " and "may be asserted only as to those offenses for which criminal proceedings have formally begun."  (*DePriest, supra,* at p. 33; *People v. Webb* (1993) 6 Cal.4th 494, 527.)  Before the reenactment, there were no adversarial judicial proceedings, formal charges, or indictment pending in connection with the SOS crimes.  Thus, defendant's right to the assistance of counsel for those offenses had not attached at the time of the reenactment.

Defendant relies on *Escobedo v. Illinois* (1964) 378 U.S. 478, 490–491 to argue the right to counsel attached when he became the focus of the detectives' investigation.  Defendant's reliance on *Escobedo* is misplaced.  As we have previously explained, the high court has made clear the right to counsel at issue there was related to the Fifth Amendment privilege against self-incrimination and prophylactic measures available to suspects undergoing custodial interrogation, and *not* the Sixth Amendment right to counsel.  (*DePriest, supra,* 42 Cal.4th at p. 34, fn. 9.)  Moreover, the "focus" rule defendant urges that might once have applied in the context of the right against self-incrimination, has since been repudiated.  (See, e.g., *Stansbury v. California* (1994) 511 U.S. 318, 326.)

Finally, defendant claims the reenactment should have been suppressed because his cooperation was improperly induced by Sergeant Lewis's "promise" that he would be transferred out of Folsom Prison.  The record belies this claim.  As the trial court found, Lewis simply asked defendant whether he was willing to cooperate with an ongoing investigation and if so, detectives would be picking him up that weekend.  Despite defendant's concerns about being placed in administrative segregation and a high security unit, Lewis specifically testified that no promises concerning defendant's housing situation at the prison were made to induce his cooperation.  Additionally, any prior softening up regarding Costello that might have occurred during the initial interview was

42

not a factor at the time of the reenactment, as Costello had long been cleared of any suspected wrongdoing. The reenactment thus was properly admitted.

### 6. Cumulative prejudice

Defendant contends that even if the alleged errors at the guilt phase of the trial were individually harmless, they were cumulatively prejudicial. We have found a single error, a violation of defendant's statutory right to be present, and, assuming the issue was not forfeited, concluded that error was harmless. There are no additional errors to cumulate and therefore no cumulative prejudice.

### B. Penalty Phase Issues

### 1. Jury selection issues

#### a) Exclusion of Hispanic jurors from the penalty phase jury.

Defendant alleges that the jury selection procedures utilized in the Rancho Cucamonga District of the San Bernardino County Superior Court systematically excluded Hispanics and that the trial court erred in denying his motion to quash the jury venire. As a result, he contends, his penalty phase jury was not composed of a representative cross-section of the community, depriving him of his right to due process and a fair trial before an impartial jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution. The error, he argues, is structural, requiring automatic reversal.

We conclude the trial court did not err in denying defendant's motion to quash, as defendant failed to make a prima facie showing of the systematic exclusion of Hispanic jurors. This claim therefore is without merit.

#### (1) Background

During penalty phase jury selection, defendant filed a motion to quash the jury panel on the ground Hispanics were systematically excluded from those summoned for

43

service in the Rancho Cucamonga District. The trial court conducted a hearing on the motion, in which the following evidence was presented.

Shirley Stoudt, the Deputy Jury Commissioner of San Bernardino County Superior Court, testified concerning how potential jurors were summoned from a master list compiled from Department of Motor Vehicles and Registrar of Voters records, and then processed according to statutory exemptions as well as the California Rules of Court. The jury commissioner's office was not aware of the race, religion, or ethnic background of the jurors when excusing or exempting them for service and, according to Stoudt, did nothing to keep any minority group off the jury panels. A voluntary countywide survey of potential jurors showed 4.3 percent were excused for language difficulties and 1.78 percent were excused for lack of citizenship. Although these figures included all languages and noncitizens and the individuals were not asked to state their ethnic or racial background, she estimated that Hispanics and Spanish-speaking individuals would have constituted a larger percentage of these groups than other ethnicities.

Julia Arias, a politically active elementary school teacher and community leader who grew up in Fontana and Rancho Cucamonga, testified concerning her childhood, education, and religious upbringing and the racial discrimination her family faced.[4] Arias felt Hispanics were underrepresented on juries because they were forced to refuse jury service in order to preserve their "meager pay" and because they were unaware of the importance of exercising their right to vote. She then read various statistics from the Weeks study (discussed below) and suggested the court read the survey "more carefully" to find out what was happening to her community. John Weeks, Ph.D.,[5] was retained by

---

[4] The trial court permitted Arias to give a narrative statement rather than respond to questions from defense counsel.

[5] A professor of geography and director of the International Population Center at San Diego State University, Weeks had previously qualified as an expert witness in demography and statistics in more than 50 cases.

the defense to conduct a demographic survey of jurors reporting for jury duty in San Bernardino County. Of 574 potential jurors for the Rancho Cucamonga District surveyed over the course of five weeks, 16.9 percent indicated they were Hispanic. Weeks compared this to the 23.1 percent he estimated to be Hispanics in the "juror eligible" population in the Rancho Cucamonga District in 1995. Weeks geometrically extrapolated the 23.1 percent figure from 1980 and 1990 census data and from projections of the ethnic makeup of every county in the state for 2000 and 2010 by the California Department of Finance, Demographic Research Unit. Based on these figures, Weeks found there was an "absolute disparity"[6] of 6.2 percent between the number of Hispanics reporting for jury duty and the number of eligible Hispanics residing in the judicial district. Dividing the absolute disparity of 6.2 percent by the community percent of 23.1, he concluded there was a "relative disparity"[7] of 27 percent. Thus, according to Weeks, there were 27 percent fewer Hispanics in the Rancho Cucamonga jury pool than would be expected from the demographics of the community. Dividing the results by gender, he further found an absolute disparity of 7.2 percent and relative disparity of 30 percent for male Hispanics.[8]

---

[6] " 'Absolute disparity' is the difference between the underrepresented group's percentage in the jury-eligible population and the group's percentage in the actual jury venire." (*People v. Anderson* (2001) 25 Cal.4th 543, 564, fn. 6 (*Anderson*).)

[7] Relative or " 'comparative disparity' measures the *percentage* by which the number of group members in the actual venire falls short of the number of group members one would expect from the overall 'eligible population' " of the group who are eligible for jury service. (*Anderson, supra,* 25 Cal.4th at p. 564, fn. 6; *People v. Ramirez* (2006) 39 Cal.4th 398, 441 (*Ramirez*); *People v. Sanders* (1990) 51 Cal.3d 471, 492, fn. 5 (*Sanders*).) In this case, 6.2 percent divided by 23.1 percent is 26.8 percent.

[8] However, Weeks admitted on cross-examination that based solely on 1990 census data, Hispanics comprised 18.7 percent of the jury-eligible population, which translated to an absolute disparity of Hispanic jurors of only 1.8 percent and a relative disparity of 10 percent.

Relying on the above disparities, Weeks concluded there was "a substantive and a statistically significant underrepresentation of Hispanics showing up for jury duty in the Rancho Cucamonga District courthouse."  The biggest alleged cause of the disparity was lack of follow-up by the jury commissioner's office for unserved jury summonses.  Weeks also criticized the summons form for stating "do not forward," for prominently inviting excusal requests, and for not explicitly asking for address corrections.  He believed this disadvantaged Hispanics who were more "residentially mobile" than non-Hispanics.  Based on Weeks's opinions, defendant argued the court could end the systematic discrimination and disenfranchisement of Hispanics in San Bernardino County by prohibiting the removal of jurors except for the reasons authorized under Code of Civil Procedure section 203,[9] by preventing jury clerks from removing jurors without judicial authorization, and by taking measures to ensure adequate follow-up of jurors who initially fail to appear for jury service.  Weeks claimed that San Diego County had made "some remedies" in this regard, which increased the number of Hispanics on its master list.

The trial court denied defendant's motion to quash the jury venire, ruling there was no underrepresentation of Hispanics by significant numbers due to systematic exclusion in the jury selection process.

---

[9]    Code of Civil Procedure section 203, subdivision (a), provides in part:  "All persons are eligible and qualified to be prospective trial jurors, except the following:
    "(1) Persons who are not citizens of the United States.
    "(2) Persons who are less than 18 years of age.
    "(3) Persons who are not domiciliaries of the State of California . . . .
    "(4) Persons who are not residents of the jurisdiction wherein they are summoned to serve.
    "(5) Persons who have been convicted of malfeasance in office or a felony, and whose civil rights have not been restored.
    "(6) Persons who are not possessed of sufficient knowledge of the English language . . . .
    "(7) Persons who are serving as grand or trial jurors in any court of this state.
    "(8) Persons who are the subject of conservatorship."

46

*(2) Analysis*

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364.) Defendant "satisfied the first prong of this test, because Hispanics are a 'distinctive' or cognizable group." (*Ramirez, supra,* 39 Cal.4th at p. 445; see *Castaneda v. Partida* (1977) 430 U.S. 482, 495.) With respect to the second prong, however, he failed to show the representation of Hispanic jurors was unfair and unreasonable compared to their numbers in the community.

Respondent contends the most reliable figures provided by defense expert Weeks, based solely on 1990 census data, demonstrated an absolute disparity of Hispanic jurors of only 1.8 percent and a relative disparity of only 10 percent. But even assuming the statistical disparities Weeks calculated based on extrapolations for 1995 were credible—an absolute disparity of 6.2 percent and a relative disparity of 27 percent for all Hispanics, and an absolute disparity of 7.2 percent and relative disparity of 30 percent for male Hispanics—defendant still failed to satisfy the second prong because such disparities are not constitutionally significant. (See, e.g., *People v. Burgener* (2003) 29 Cal.4th 833, 856 (*Burgener*) [expressing uncertainty as to whether an absolute disparity of 10.7 percent, which produced a relative disparity of 65 percent, satisfied the second prong of the *Duren* test]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1156 [concluding an absolute disparity between 2.7 and 4.3 percent and a comparative disparity between 23.5 and 37.4 percent was not constitutionally significant]; *People v. Bell* (1989) 49 Cal.3d 502, 528, fn.15 [finding it was "far from clear" that a 5 percent absolute disparity was sufficient]; see also *Swain v. Alabama* (1965) 380 U.S. 202, 208–209 [10 percent

47

absolute disparity inadequate]; *U. S. v. Cannady* (9th Cir. 1995) 54 F.3d 544, 548 ["absolute disparities below 7.7% are insubstantial and constitutionally permissible"].)

Even had defendant demonstrated a constitutionally significant disparity, he still would have failed to satisfy the third prong of the test. "A defendant does not discharge the burden of demonstrating that the underrepresentation was due to systematic exclusion merely by offering statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process." (*Burgener, supra,* 29 Cal.4th at p. 857.)

The Rancho Cucamonga District master list used in this case was derived from Department of Motor Vehicle's and voter registration lists. We have held that such a list " ' "shall be considered inclusive of a representative cross-section of the population" ' where it is properly nonduplicative." (*People v. Ochoa* (2001) 26 Cal.4th 398, 427 (*Ochoa*); see, e.g., Code Civ. Proc. § 197, subd. (b) [a master jury list assembled from lists of registered voters and driver's license holders, "when substantially purged of duplicate names, shall be considered inclusive of a representative cross section of the population"].) There is no suggestion that the master list was duplicative in any way.

As shown by the jury commissioner's testimony, moreover, juror excusals were based on race-neutral reasons provided by statute and the California Rules of Court. Indeed, the excusal forms did not even indicate the prospective juror's race. The excusal categories of non-citizenship and lack of understanding of English encompassed all ethnicities and national origins, not simply Hispanics or Spanish-speaking individuals. "Where, as here, a county's jury selection criteria are neutral with respect to the distinctive group, the defendant must identify some aspect of the manner in which those criteria are applied that is not only the probable cause of the disparity but also constitutionally impermissible." (*Burgener, supra,* 29 Cal.4th at p. 858; see *Sanders, supra,* 51 Cal.3d at pp. 492–493 ["Evidence that 'race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage

48

of a particular class of jurors than would result from a random draw' is insufficient to make out a prima facie case."].)  Defendant failed to do so in this case.

Julia Arias, the community activist who testified for the defense, suggested Hispanics were underrepresented because they were unaware of the importance of voting. However, "the failure of a particular group to register to vote in proportion to its share of the population cannot constitute improper exclusion attributable to the state."  (*Ochoa, supra,* 26 Cal.4th at p. 427.)  Arias also speculated Hispanics were forced to refuse jury service in order to avoid losing the "meager pay" they received in their employment. And defense expert John Weeks suggested, without citation to evidence, that Hispanics in Rancho Cucamonga were "residentially mobile" because they had low incomes, were unlikely to own homes and were transient as renters, and consequently more difficult to summon for jury duty.  However, "[s]peculation as to the source of the disparity is insufficient to show systematic exclusion [citation], as is evidence the disparity is unlikely to be a product of chance [citation] or has endured for some time [citation]." (*Burgener, supra,* 29 Cal.4th at p. 858.)

Finally, Weeks opined San Bernardino County could have remedied the alleged disparity in Hispanic jurors by following up on unserved summonses, soliciting address corrections, and making the excusal form less prominent.  Even assuming he was correct, merely pointing to a remedy is not enough. (*Ochoa, supra,* 26 Cal.4th at p. 428.)  The United States Constitution, while forbidding the exclusion of members of a cognizable class of jurors, " ' "does not require that venires created by a neutral selection procedure be supplemented to achieve the goal of selection from a representative cross-section of the population." ' [Citation.]  So long as the state uses criteria that are neutral with respect to the underrepresented group, the state's failure to adopt other measures to increase the group's representation cannot satisfy *Duren*'s third prong." (*Burgener, supra,* 29 Cal.4th at pp. 857–858.)

As defendant did not satisfy his burden under the second and third prongs of *Duren*, a prima facie case of underrepresentation and systematic exclusion of Hispanic jurors was not made. Accordingly, the trial court properly denied defendant's motion to quash the venire.

### b) Exclusion of life-inclined juror for cause

Defendant claims the trial court erroneously excluded Prospective Juror G.P. for cause based solely on his written answers to a jury questionnaire and without any opportunity for voir dire. He contends that if G.P. had been given the opportunity to respond to questions in person, the court could have clarified whether he was qualified to serve on a capital jury. As a result of the allegedly improper removal of this prospective juror, defendant argues he was subjected to "a tribunal organized to return a verdict of death" in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 15 and 16 of the California Constitution.

To the extent defendant asserts error in the court's ruling on challenges for cause based solely on the jurors' responses to the questionnaires without voir dire, the claim is forfeited because he stipulated to this procedure. On the merits, we conclude the court did not err in excusing Prospective Juror G.P. for cause based on his juror questionnaire, in which he stated an inability to impose the death penalty in a contested penalty phase.

### (1) Background

Before jury selection for the penalty phase, defendant moved for sequestered voir dire of prospective jurors.[10] The trial court denied the request for individual voir dire of all jurors but acknowledged that oral or questionnaire responses might warrant sequestered voir dire of particular jurors on particular issues.

---

[10] Code of Civil Procedure section 223 provides that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases."

Thereafter, the trial court proposed ruling on stipulated dismissals, followed by challenges for cause based solely on questionnaire responses, noting that denial of any challenge would be without prejudice, allowing counsel the opportunity to individually question the juror. "Regular" voir dire would then be conducted on the rest of the panel. Defense counsel endorsed this procedure as "the next best thing" to sequestered voir dire of the entire jury panel and commented on "[t]he beauty of the Court's procedure" in protecting against potential jurors who may "pollute the panel." As the time for jury selection neared, defendant personally appeared in court and expressly agreed to this procedure, which the court, pursuant to the parties' stipulation, then utilized.

Both the prosecution and defense moved to exclude for cause various prospective jurors solely on the basis of their questionnaire responses. Prospective Juror G.P. was among those whom the prosecutor challenged. In his questionnaire, when asked whether he had "any philosophical, religious, or moral feelings that would make it difficult or impossible for you to sit in judgment of another person," G.P. wrote "being educated and raised in the strict Catholic teachings and standards, I find it hard to be a judge of another person. I was taught that God is the only rightful judge." Although he also wrote, "I have no problem in judging as to whether or not a person is guilty or has done wrong," he indicated that he did "have a problem as to whether or not punishment or appropriate punishment is right or wrong." Despite his generally enjoying jury service "because the law has always been fascinating" to him, G.P. reiterated, "[i]t just so happens that sentencing someone is against my beliefs."

Prospective Juror G.P. further wrote he would be greatly influenced by the Catholic Church's opposition to the death penalty, writing "I have always been taught to try to understand why people become the way they are and that one might always forgive and that one might never lose hope. Somehow these teachings have become my own and have influenced my decision in life." G.P. reaffirmed he "strongly" opposed the death penalty, opining it served only an economic purpose and was part of a system that "has

51

lost all hope. That should not be the case in any system." When asked "what types of crime, if any, deserve the death penalty," he answered, "I couldn't think of one." G.P. also wrote life in prison without parole served no purpose other than draining the economy and he would "only agree to it if it is the only solution for a person not to commit harm to society again."

Prospective Juror G.P. indicated he would "have to hear the case first" to know whether he could impose life without the possibility of parole or the death penalty. He also stated it was "very possible" to see himself rejecting the death penalty and choosing life without possibility of parole "because of my beliefs," but rejecting life without the possibility of parole and choosing the death penalty was "a possibility" only if the defendant "himself requests it and if he is sound in mind and body."

The defense argued that although Prospective Juror G.P. expressed a preference for life without the possibility of parole, his responses also indicated he would be willing to listen to the case before selecting a punishment. The prosecution responded that G.P.'s answers demonstrated his religious beliefs, which taught him the death penalty was improper, would override this willingness. Defense counsel did not ask to question G.P. in order to clarify his qualification to serve on a capital jury. Without conducting voir dire of G.P., the court granted the challenge for cause, finding his strong religious beliefs combined with his strong opposition to the death penalty indicated he would be "substantially impaired in seriously considering the death penalty as an option."

### (2) Analysis

Defendant argues the trial court erred in failing to conduct voir dire to clarify Prospective Juror G.P.'s views on capital punishment and in granting the prosecutor's challenge based on his juror questionnaire responses alone. However, defendant forfeited this claim when he expressly agreed to that procedure. Defendant, moreover, did not request individual voir dire of Prospective Juror G.P. before the court ruled on the

52

prosecutor's challenge for cause, instead opposing the challenge by arguing that G.P.'s questionnaire responses indicated he could be a fair juror. (*People v. Cook* (2007) 40 Cal.4th 1334, 1342 (*Cook*) [defendant who agreed to " 'submit on the questionnaire' " challenges for cause to certain prospective jurors and waived any further questioning, forfeited right to complain on appeal of the court's failure to interrogate that prospective juror]; cf. *People v. Stewart* (2004) 33 Cal.4th 425, 452 (*Stewart*) [finding error where trial court acted without the parties' prior agreement in granting several prosecution challenges for cause solely on the basis of the questionnaire responses, despite earlier assurances that it would conduct further oral voir dire to address any ambiguous responses and despite the defendant's repeated objections to the procedure].)

Alternatively, defendant contends the trial court erred in excluding Prospective Juror G.P. for cause simply because he expressed strong opposition to the death penalty in his questionnaire. A prospective juror's personal views concerning the death penalty do not necessarily afford a basis for excusing the juror for bias in a capital case. (See *Uttecht v. Brown* (2007) 551 U.S. 1, 6 [" '[A] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State.' "].) Rather, "[t]o achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*People v. Blair* (2005) 36 Cal.4th 686, 741, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424; see *Witherspoon v. Illinois* (1968) 391 U.S. 510.) Under this standard, a prospective juror is properly excluded in a capital case if he or she is unable to follow the trial court's instruction and "conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*People v. McWhorter* (2009) 47 Cal.4th 318, 340; see *People v. Jenkins* (2000) 22 Cal.4th 900, 987 (*Jenkins*).)

A trial court's ruling on a challenge for cause based solely on a juror's responses on a written questionnaire is subject to de novo review by this court. (*People v. Avila* (2006) 38 Cal.4th 491, 529 (*Avila*).) We review the record to determine whether the trial court had sufficient information regarding Prospective Juror G.P.'s state of mind to permit it to reliably determine whether his views on the death penalty would prevent or substantially impair the performance of his duties in this case. (*Stewart, supra,* 33 Cal.4th at p. 445; see also *Avila*, at p. 531 ["a prospective juror in a capital case may be discharged for cause based solely on his or her answers to the written questionnaire if it is clear from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law"].)

In *Cook, supra,* 40 Cal.4th at pages 1343–1344, and *Avila, supra,* 38 Cal.4th at page 532, we upheld the trial court's orders excusing prospective jurors whose questionnaire answers showed they could not impose the death penalty even though they also responded they could set aside their personal feelings and follow the law. The situation before us presents a similar dichotomy.

In his questionnaire, Prospective Juror G.P. stated he had strong religious beliefs that made it difficult for him to judge someone else because he was taught God is the only rightful judge, and although he had no problem judging another person on the issue of guilt, he had a problem with deciding the appropriate punishment. Significantly, G.P. stated unequivocally he was strongly opposed to the death penalty, which he saw as economically motivated and as part of a system that had "lost all hope," and he could not think of a single crime deserving the death penalty. Although G.P. stated it was a "possibility" he could choose the death penalty in an appropriate case, the example he gave was a case in which the defendant was competent and requested it. However, in another response, G.P. implied he would not make up his mind on punishment until he heard the case.

We conclude Prospective Juror G.P.'s strong religious beliefs and opposition to capital punishment amply support the conclusion he would have been prevented or substantially impaired from performing his duties in this particular case. His express reluctance to sit in judgment of someone on the issue of punishment made him particularly unqualified to serve on defendant's jury, as G.P. was being considered for service on a penalty phase jury that would *only* be deciding the appropriate punishment for defendant. Although stating somewhat ambiguously he would have to hear the case first to know whether he could realistically impose either death or life without the possibility of parole, G.P. repeatedly expressed his opposition to the death penalty for all crimes, with a possible exception for a case in which a competent defendant exercised his right to a jury trial in order to request to be executed. The trial court therefore did not err by excusing Prospective Juror G.P. for cause based on his responses to the jury questionnaire.

### c) *Prosecutor's use of peremptory challenges to strike African-American jurors*

Defendant claims the prosecutor improperly exercised four of his six peremptory challenges against African-Americans—Prospective Jurors D.W., A.L., S.A.-M., and A.C.—during penalty phase jury selection. (See *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d. 258 (*Wheeler*).) He argues the trial court erred in failing to find a prima facie case of discrimination based on the four challenges and abdicated its duty to conduct a sincere evaluation of the prosecutor's reasons for excusing those potential jurors. Their improper removal, he contends, requires automatic reversal of the judgment.

This claim fails for several reasons. First, defendant failed to make a sufficient record demonstrating Prospective Juror A.L. was a member of a cognizable class. Second, defendant forfeited any *Batson/Wheeler* claim regarding Prospective Jurors S.A.-M. and A.C. by failing to object to their excusal prior to the swearing of the jury and

55

alternates. Finally, as to Prospective Juror D.W., the trial court correctly ruled defendant failed to make a prima facie showing the prosecutor excused the juror for reasons of race.

*(1) Background*

After the prosecutor exercised his first peremptory challenge against a non-African-American juror, defense counsel made a premature *Batson/Wheeler* motion. He argued prospectively that if the prosecutor were to exercise a peremptory challenge against any African-American jurors, a prima facie case of discrimination would be established because (1) of the prosecutor's six for-cause challenges denied by the court, "approximately [50] percent of those persons were [B]lack," and (2) the prosecutor had devoted an inordinate amount of time—approximately 75 to 80 percent of the voir dire transcript pages—questioning African-American jurors.[11] The prosecutor objected to what he considered defense counsel's attempts to intimidate him in his exercise of peremptory challenges. After additional discussion, the court found, considering the explanations offered for the prosecutor's challenges for cause to minority and non-minority jurors, there had been no attempt to systematically exclude minority jurors.

After voir dire continued, the prosecutor exercised his second peremptory challenge against Prospective Juror D.W. Defense counsel objected: "*Batson* challenge. She's a correctional officer. She was one he picked on for no good reason just to ask a lot of questions." The trial court denied the challenge, concluding defendant had not made a prima facie showing of a systematic pattern of exclusion of minority jurors. It invited the prosecutor to place his reasons for exercising the challenge on the record, noting, however, he was under no obligation to do so. The prosecutor declined the invitation, stating he would provide an explanation for each minority juror for whom he

---

[11] Defense counsel did not restrict his *Batson/Wheeler* objections to African-Americans or other racial groups. He also filed a written *Batson/Wheeler* motion arguing that Vietnam veterans were a cognizable class.

exercised a peremptory challenge at the end of jury selection. The court thereafter excused D.W.

The prosecutor exercised his third peremptory challenge against Prospective Juror A.L. Defense counsel objected: "*Batson* again." The court excused A.L. without explicitly ruling on defendant's challenge.

The prosecutor exercised his fourth peremptory challenge against Prospective Juror S.A.-M. Defense counsel stated: "I'll wait till he does one more, then I'll do that. I'm going to make a motion. So we don't have to argue it each time." The trial court responded: "All right. For the record, the court notes that there was a challenge for cause as to [S.A.-M.] and she did indicate an attitude that was definitely leaning against the death penalty, although probably not sufficient, the court found, to grant a challenge for cause. But certainly it's a basis for an exercise of the peremptory challenge."

The prosecutor exercised his fifth challenge against Prospective Juror A.C. Defense counsel made no objection, and the trial court excused A.C. Subsequently, the parties accepted 12 jurors after the prosecutor exercised his sixth and final peremptory challenge without any further *Batson/Wheeler* objections. During the selection of the alternate jurors, the defendant made no *Batson/Wheeler* objections. Thereafter, six alternate jurors were chosen.

After the jurors and alternate jurors were sworn, the prosecutor asked whether there was a *Batson/Wheeler* motion still pending. The trial court and defense counsel indicated it had been denied, referring to the colloquy that occurred in connection with Prospective Juror D.W. The prosecutor, defense counsel, and the court all noted the prosecution thereafter had exercised peremptory challenges against two other African-American prospective jurors, S.A.-M. and A.C. Defense counsel then stated, "I don't believe I said anything when he did that. The court confirmed, "Correct. You didn't renew or make another motion." Defense counsel affirmed, "I had made the motion.

You had denied it. And I guess the reasons for my not doing it again will have to go with me to the federal habeas or whatever."

The prosecutor then asked for the opportunity to "go on the record" regarding the three challenges. The trial court granted this request, but first stated: "[E]ven after the two additional challenges[,] the Court is still satisfied that there is not a . . . prima facie demonstration to the Court of any systematic or attempted systematic exclusion of [B]lack jurors by the prosecution, particularly with regard to the last two peremptories of [B]lack jurors. [¶] The responses in the questionnaire, and the responses of the jurors orally, in the Court's view, provided adequate non-racial basis for the peremptory challenges. And if the motion had been renewed, it would have been denied again at that point, again on the basis that there was not a prima facie showing. [¶] [The c]ourt will also note that the jury that the prosecution passed on that was actually sworn does include two [B]lack jurors. Which is, again, additional evidence to the Court that there was not an attempt to systematically exclude [B]lacks."[12]

Thereafter, the prosecutor explained he excused Prospective Juror D.W. because she was argumentative during voir dire and had used defensive body language. D.W. also linked her job as a prison guard with the possibility of becoming a psychologist who counseled inmates, which was problematic from the prosecutor's perspective because defendant's penalty phase specifically involved psychological and psychiatric testimony. D.W. further described herself as being "on the opposite end of the spectrum" of Prospective Juror D.P.,[13] which indicated to the prosecutor D.W. would tend to always

---

[12] In allowing the prosecutor to make a record of his race-neutral reasons for excusing the jurors in question, even though finding no prima facie case of discrimination, the trial court followed the "better practice." (*People v. Bonilla* (2007) 41 Cal.4th 313, 343, fn.13 (*Bonilla*) [noting that such information assists the reviewing court in assessing the ruling on appeal].)

[13] During voir dire, Prospective Juror D.P. had expressed negative views about "counselors, therapists, whatever you want to call them, psychologists, psychiatrists," as

58

believe such testimony.  And when the prosecutor asked D.W. about rolling her eyes while D.P. was speaking during voir dire, D.W. at first admitted to doing so, but then later approached the prosecutor during a break, in violation of a court order not to discuss the case, and told him she was just batting her eyes rather than rolling them.  This behavior, coupled with animosity in D.W.'s voice, concerned the prosecutor.

With respect to Prospective Juror A.C., the prosecutor first noted she failed to write responses to many of the questions regarding her views on the death penalty.  She further expressed "severe" reservations about the death penalty during voir dire and was "dishonest" in recounting she had heard on the news about a recent execution in California, which never occurred.

Finally, concerning Prospective Juror S.A.-M., the prosecutor explained he excused her due to her "serious reservations about the use of the death penalty." Responses in the juror questionnaire indicated her religious beliefs taught her not to judge others and she would not consider imposing the death penalty on a combat veteran.  She also had a relative who was killed by a deputy sheriff in Los Angeles and her family wanted criminal charges brought against the sheriff's department.  This potential bias against law enforcement concerned the prosecutor as well.  And despite S.A.-M.'s recognition there were "probably circumstances where the death penalty could be imposed," she wrote she hoped never to be part of such a decision.  Such reservations about the death penalty, which were further developed during voir dire, led the prosecutor to believe S.A.-M. would not be an appropriate juror for defendant's case.

Defense counsel did not respond to or comment on the explanations volunteered by the prosecutor.  Having denied defendant's *Batson/Wheeler* motion regarding

---

well as skepticism about two psychological experts evaluating someone over a short time and suddenly claiming to know "what was wrong with this person."  D.P. also stated an expert's credentials "doesn't mean squat" if they have only spent a few hours, days, or weeks talking with the person they are evaluating.  D.P. further admitted she was "opinionated."

59

Prospective Juror D.W. for failure to make a prima facie showing of discrimination, the trial court did not evaluate or otherwise render any further ruling on the prosecutor's explanations, merely stating "all right" and then calling a recess.

*(2) Analysis*

**(a) Prospective Juror A.L.**

Respondent argues defendant forfeited any claim of error with respect to Prospective Juror A.L. by failing to articulate a clear *Batson/Wheeler* objection. (See *People v. Lewis* (2008) 43 Cal.4th 415, 481.) In objecting to the prosecutor's peremptory challenge of A.L., defense counsel simply stated "*Batson* again." Although defendant assumes on appeal that A.L. was one of four African-American prospective jurors against whom the prosecutor exercised peremptory challenges, the record fails to disclose what cognizable class defendant was asserting as the basis for his *Batson/Wheeler* objection to the peremptory challenge of A.L.

It is true, as defendant notes in his reply, his first *Batson/Wheeler* objection concerned an African-American prospective juror, D.W. But defendant did not provide any factual basis for the objection regarding A.L. or make any record as to what cognizable class A.L. allegedly belonged to. A.L. was never identified as African-American during voir dire, and in fact self-identified as "Caucasian," "Danish," and "Dane" in his jury questionnaire. Nor was A.L. identified as African-American in any of the *Batson/Wheeler* discussions contained in the record. To the contrary, in their discussion following the swearing of the jury, the court, defense counsel, and the prosecutor all stated that there had been *three* African-American prospective jurors excused by the prosecution and identified those three jurors as D.W., S.A-M., and A.C. Defense counsel, moreover, did not restrict his *Batson/Wheeler* motions to racial groups; he also attempted to argue that Vietnam veterans were a cognizable class. The failure to

clearly articulate the *Batson/Wheeler* objection to the peremptory challenge against A.L. forfeited the issue for appeal.

### (b) Prospective Jurors S.A.-M. and A.C.

Respondent contends defendant also forfeited a claim of *Batson/Wheeler* error with respect to Prospective Jurors S.A.-M. and A.C. by failing to make a *Batson/Wheeler* objection. In order to preserve a *Batson/Wheeler* claim based on the prosecutor's peremptory challenges, the defendant must make a timely objection. (*People v. McDermott* (2002) 28 Cal.4th 946, 969.) To be timely, a *Batson/Wheeler* objection must be made before the jury is sworn. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1154; *People v. Thompson* (1990) 50 Cal.3d 134, 179.)

When the prosecutor exercised his fourth peremptory challenge against S.A.-M., an African-American prospective juror, defense counsel indicated he was "going to make a motion," but would wait until the prosecutor "does one more." However, he did not object when the prosecutor exercised his next peremptory challenge against A.C., another African-American prospective juror, nor did he make a motion before the jurors and alternates were sworn in and the venire excused. After the jurors and alternate jurors were sworn and the prosecutor asked whether there was a *Batson/Wheeler* motion still pending, defense counsel agreed with the trial court he had not renewed or made new *Batson/Wheeler* motions with respect to S.A.-M. and A.C., stating: "I guess the reasons *for my not doing it again* will have to go with me to the federal habeas or whatever." (Italics added.) Defense counsel also did not discuss or contest the prosecutor's volunteered explanations for the two challenges. In light of the lack of a timely, or even untimely, objection, any claim of *Batson/Wheeler* error regarding Prospective Jurors S.A.-M. and A.C. was forfeited.

## (c) Prospective Juror D.W.

Defendant did make a timely, clearly articulated *Batson/Wheeler* objection with respect to the prosecutor's peremptory challenge against Prospective Juror D.W. The applicable law is well settled. While a prosecutor ordinarily is entitled to exercise peremptory challenges for almost any reason at all, "[b]oth the state and federal Constitutions prohibit the use of peremptory challenges to exclude prospective jurors based on race . . . ." (*Bonilla, supra,* 41 Cal.4th at p. 341.)

A three-stage procedure applies to the evaluation of *Batson/Wheeler* motions. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

This subclaim involves only the first of these three stages—whether defendant made out a prima facie case of racial discrimination. Although the prosecutor subsequently volunteered his reasons for challenging D.W., "the trial court did not evaluate the prosecutor's stated reasons, either explicitly or implicitly." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 469.) Rather, the court expressly ruled defendant had not made a prima facie case *before* the prosecution's recitation of reasons and denied the *Batson/Wheeler* motion on this basis. The trial court merely allowed the prosecution "to preserve for the record its reason for those excusals."

Nevertheless, in finding defendant failed to make a prima facie case of racial discrimination, the trial court appears to have used an incorrect standard, finding "no systematic pattern of exclusion," rather than no inference of discriminatory purpose. (See, e.g., *Avila, supra,* 38 Cal.4th at pp. 554–555 [trial court was under the mistaken

62

impression that only pattern of discrimination through multiple excusals could make prima facie showing].)  We therefore independently review the record to " 'resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race.' "  (*Id.* at p. 554.)

Certain types of evidence are relevant in determining whether a defendant has carried his burden of showing an inference of discriminatory excusal, such as whether the prosecutor "struck most or all of the members of the identified group from the venire or used a disproportionate number of his peremptories against the group," whether the excused jurors had little in common other than their membership in the group, and whether the prosecutor engaged in "desultory voir dire" or no questioning at all. (*Wheeler, supra,* 22 Cal.3d at pp. 280–281.)  Although a "defendant need not be a member of the excluded group," it is significant if he is and if, in addition, his victims are members of the group to which the majority of the remaining jurors belong.  (*Id.* at p. 281; see *People v. Kelly* (2007) 42 Cal.4th 763, 779–780.)

Defendant argues the prosecutor used a disproportionate number—four of six—of his peremptory challenges to excuse African-Americans from the jury pool.  The record does not support defendant's claim.  In selecting a jury for the penalty phase, the prosecutor exercised a total of eight peremptory challenges to potential jurors—six during the selection of the 12 jurors and two during the selection of the six alternate jurors—only three of which were used to remove African-Americans D.W., S.A.-M., and A.C.  As noted, the record does not support defendant's contention that Prospective Juror A.L. was African-American.

The prosecutor, moreover, passed two African-American prospective jurors who ultimately were seated on the jury.  (*People v. Clark* (2011) 52 Cal.4th 856, 906 ["Although the circumstance that the jury included a member of the identified group is not dispositive [citation], 'it is an indication of good faith in exercising peremptories . . .' and an appropriate factor to consider in assessing a [*Batson/Wheeler*] motion."].)  The

prosecutor's use of three of eight (or 38 percent) of his peremptory challenges to excuse African-American prospective jurors, particularly where the other two African-American prospective jurors were passed and seated on the jury, "does not support an inference of bias." (*People v. Cornwell* (2005) 37 Cal.4th 50, 70.)

Moreover, the prosecutor engaged in more than a desultory voir dire of Prospective Juror D.W. Indeed, defendant complains that no juror was publicly questioned by the prosecution "more relentlessly" than D.W. However, the thoroughness of the prosecutor's probing of D.W. was not outside the norm and does not support an inference of racial bias.

We discern at least one race-neutral reason for excusing Prospective Juror D.W. that is "apparent from and 'clearly established' in the record." (*People v. Scott* (June 8, 2015, S064858) __ Cal.4th __ [at p. 20].) The defense case for the penalty phase would rely heavily on psychological testimony concerning PTSD resulting from defendant's abusive childhood and experiences in Vietnam. Not only did D.W. express a strong receptivity toward such testimony, stating such experts "would be necessary," she also indicated she wanted to "lateral over into prison counseling." This was a legitimate race-neutral reason for excusing D.W. (See, e.g., *Avila, supra,* 38 Cal.4th at p. 556 [a juror who indicated she worked closely with psychologists and psychiatrists as a nurse in a psychiatric ward and valued their opinions provided a reason other than racial bias for the prosecutor's challenge]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1124 [prosecutor's belief that the prospective juror would place too much weight on the opinion testimony of mental health experts could justify the peremptory challenge].)

Based on our independent review of the record of voir dire, we conclude the totality of the relevant facts does not support inferring the prosecutor challenged Prospective Juror D.W. because of her race. The trial court therefore did not err in denying defendant's *Batson/Wheeler* motion for failure to establish a prima facie case.

64

### d) Denial of a continuance prior to jury selection

Defendant claims the trial court abused its discretion by denying his request for a continuance of the penalty phase based on publicity surrounding the April 1995 bombing of the Murrah Federal Building in Oklahoma City. He contends the denial of this request caused voir dire to be conducted shortly after the bombing in "an unduly prejudicial atmosphere" and thus violated his constitutional rights to due process and a fair trial.

Before the beginning of jury selection in the penalty phase, defendant moved for a continuance from May until September 1995, arguing there was good cause in light of "the difficulty of selecting a fair and impartial jury in this case, due to the interconnection of some of the major issues in [defendant's] life, and of those persons accused of the bombing of the federal building in Oklahoma City." He pointed to the circumstance that Timothy McVeigh, one of the Oklahoma City bombing suspects, was an army veteran who might also raise a PTSD defense. Defendant also argued future delays might occur because one of the defense experts was working with trauma victims in Oklahoma City. The trial court, noting among other circumstances that McVeigh had fought in the Gulf War while defendant was a Vietnam War veteran, found no similarities between defendant's case and the Oklahoma City bombing. Concluding the events in Oklahoma would have no significant impact on jury selection in this case, the trial court denied defendant's request for a continuance.

A continuance may be granted only on the moving party's showing of good cause. (§ 1050, subd. (e).) "The granting or denial of a motion for continuance rests within the sound discretion of the trial court." (*People v. Mickey* (1991) 54 Cal.3d 612, 660.) In light of the lack of any relationship or similarity between the Oklahoma City bombing and defendant's case, the trial court did not abuse its discretion in finding there was no showing of good cause for a continuance.

The publicity from the Oklahoma City bombing, which differed drastically from the SOS murders in both kind and degree, had no bearing on defendant's case. Timothy

65

McVeigh detonated a 3,000- to 6,000-pound bomb, killing 168 people, including 19 children and eight law enforcement officials. (*U. S. v. McVeigh* (10th Cir. 1998) 153 F.3d 1166, 1177.) By comparison, defendant shot and killed three adult victims with whom he was acquainted during the commission of a burglary and robbery of a company for which he once worked. The Oklahoma City bombing was politically motivated with the goal of inciting a general uprising against the government (*ibid.*), whereas defendant's murders were financially motivated. The only concrete common feature argued by defense counsel, that defendant and McVeigh were both Army veterans, does not withstand scrutiny. McVeigh was not a veteran of the Vietnam War, and defendant's jury would hear defense testimony that the Vietnam conflict had many significant characteristics not present in other conflicts and that generated unique problems for Vietnam War veterans.

Not only were the supposed connections between the cases tenuous at best, the possibility of an unavailable witness and the notion that a separate tragedy would have a prejudicial effect on a jury trying this case were pure speculation. Moreover, voir dire exists exactly to explore issues of prejudice such as these. In sum, the court's ruling clearly was not manifestly erroneous or arbitrary.

### 2. Failure to sua sponte appoint a second attorney

Defendant contends the trial court violated his rights under the Sixth and Eighth Amendments to the United States Constitution and article I, section 15 of the California Constitution by failing to appoint, sua sponte, a second qualified attorney to assist defense counsel in his case. As defendant acknowledges, " '[t]he appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution.' " (*People v. Williams* (2006) 40 Cal.4th 287, 300.) It is true that by statute, California trial courts have the authority to appoint a second attorney to represent a capital defendant. (§ 987, subd. (d).) However, no sua sponte duty to appoint

66

additional counsel can be derived from a statutory provision granting only discretionary authority to the trial court to do so upon a written request and supporting affidavit by primary counsel. "Indeed, under the statute, the trial court lacks any specific authority to appoint a second attorney in the absence of a request from the first attorney and the making of a factual record sufficient to support such an appointment. To the extent that defendant's argument is that the trial courts have inherent power to appoint a second attorney, no authority supporting that proposition is cited." (*People v. Padilla* (1995) 11 Cal.4th 891, 928.) Accordingly, defendant's claim that the court erred in not appointing a second attorney in the absence of such a request fails.

### 3. Admission of photographic and videotape crime scene evidence

Defendant claims five photographs of the victims previously admitted in the guilt phase, as well as a silent videotape of the crime scene, should have been excluded in the penalty phase as irrelevant (see Evid. Code, § 350) and more prejudicial than probative (see *id.*, § 352). The photographs depicted the victims' bodies as they were found on the floor in the restroom, with close-ups of their bound hands. The video depicted the freeway next to SOS and the SOS parking lot, and a forensic expert walking around the building, hallways, and warehouse filming the register on the office desk, the lobby, and a ceiling-to-floor view of the interior of the women's bathroom, including the victims' bodies and at least one bullet casing. Defendant argues the failure to exclude these exhibits denied him due process of law under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 17 and 24 of the California Constitution.

As a preliminary matter, defendant has forfeited any claim that three of the five crime scene photographs were erroneously admitted. Although defendant moved to exclude five photographs and argued his objection at the hearing, at the time the trial court formally admitted the challenged evidence defense counsel withdrew his objection

67

to one of the photographs and affirmatively stipulated to the admission of two others. (See, e.g., *People v. Cook* (2006) 39 Cal.4th 566, 609.)

With respect to the remaining two photographs and the 30-second portion of the crime scene videotape depicting the victims in the bathroom, the trial court did not abuse its discretion by admitting this evidence. " 'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' [Citations.] Notably, however, the discretion to exclude photographs under Evidence Code section 352 is much narrower at the penalty phase than at the guilt phase. This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences [citation], and because the risk of an improper guilt finding based on visceral reactions is no longer present." (*Bonilla, supra,* 41 Cal.4th at pp. 353–354.)

The two crime scene photographs and videotape were relevant to the penalty phase of the trial. They show the circumstances of the crime, which included premeditation and deliberation on defendant's part as evidenced by his binding the victims' hands behind their backs with duct tape he had bought a week or two before committing the crimes. They further corroborated defendant's custodial statements to law enforcement officers, including that he had shot Smith several more times upon discovering he had broken free from his bindings (one of the photographs and the videotape depicts broken strands of duct tape on Smith's wrists). Finally, as in the guilt phase, the forensic pathologist used the photographs to assist the trier of fact in understanding her testimony. The admitted photographs and videotape also were not cumulative; only five photographs and 30 seconds of videotape were admitted.

Nor were the photographs or videotape substantially more prejudicial than probative. "As we have previously noted, ' "murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant." ' " (*People v.*

68

*Roldan* (2005) 35 Cal.4th 646, 713.)  Likewise in this case.  But as unpleasant as these photographs and videotape may be, they demonstrate the real-life consequences of defendant's actions.  The prosecution was entitled to have the penalty phase jury consider those consequences.  The trial court's exercise of discretion to admit them was neither statutory nor constitutional error.

### 4. Denial of automatic application for modification of death verdict

Defendant claims the trial court erred in denying his automatic application for modification of the death verdict pursuant to section 190.4, subdivision (e).  This claim, amounting to no more than a disagreement with the trial court's assessment of the evidence, lacks merit.

Section 190.4, subdivision (e), provides for an automatic application for modification of a finding or verdict imposing death in every case in which the jury has returned such a finding or verdict.  "Pursuant to section 190.4, in ruling upon an application for modification of a verdict imposing the death penalty, the trial court must reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict."  (*Crittenden, supra*, 9 Cal.4th at p. 150.)  The statute thus requires the court to make an independent determination concerning the propriety of the death penalty.  The court must state the reasons for its ruling on the record, but need not describe every detail supporting its ruling so long as the statement of reasons is sufficient to allow meaningful appellate review.  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1064.)

"On appeal, we independently review the trial court's ruling after reviewing the record, but we do not determine the penalty de novo."  (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 (*Steele*).)  Where the record shows the trial court properly performed its duty under section 190.4, subdivision (e), to conduct an independent reweighing of the

aggravating and mitigating evidence, the court's ruling will be upheld. (*People v. Abilez* (2007) 41 Cal.4th 472, 530 (*Abilez*).)

Here, the trial court expressly recognized its duty to independently review and reweigh the evidence of aggravating and mitigating circumstances to determine whether the sentence imposed was proportionate to defendant's culpability. It reviewed in detail the aggravating and mitigating factors listed in section 190.3. For example, it considered in aggravation the circumstances of the crime, including the "high-degree of cold-blooded callousness" exhibited by the killings, defendant's prior felony convictions, including the extent to which they involved attempted use of force or violence and implied threats thereof, and defendant's maturity and life experiences at the time of the crimes, including his prior prison and parole terms. In mitigation, it considered the lack of more numerous acts of violence by defendant in light of his mature age, defendant's traumatic childhood, including the physical, emotional, and sexual abuse and abandonment he experienced, his decorated service to the country and traumatic war experiences in Vietnam, and the testimony of defendant's experts concerning PTSD both generally and as related to defendant. It ultimately found the weight of the mitigating circumstances had been "greatly attenuated" by the intervening 20 years between defendant's service in Vietnam and the SOS crimes, as well as defendant's criminal convictions and acts of violence that culminated in the present offenses. The court then stated its independent judgment that the circumstances in aggravation outweighed the circumstances in mitigation and the substantial weight of the evidence supported the jury's verdict of death.

Defendant essentially argues the trial court erred because it failed to find his childhood problems, Vietnam experiences, and mental health issues to be as significant or weighty as it should have. As is apparent, however, "the trial court applied the correct standard and properly conducted an independent reweighing of the aggravating and mitigating evidence. That it did not find defendant's proffered mitigating evidence as

70

persuasive as he would have liked does not undermine this conclusion." (*Abilez, supra,* 41 Cal.4th at p. 530; see *Steele, supra,* 27 Cal.4th at pp. 1267–1268.) The court's refusal to modify the verdict is consistent with both the law and the evidence. We therefore conclude the trial court properly performed its duty under section 190.4, subdivision (e).

### 5. Penalty of death as disproportionate to defendant's individual culpability

Defendant claims his death sentence constitutes cruel and unusual punishment in violation of the state and federal Constitutions because the penalty is grossly disproportionate to his individual culpability in committing the crimes. " 'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' " (*Steele, supra,* 27 Cal.4th at p. 1269.)

Defendant received a death sentence for three burglary and robbery murders committed by him alone, purely for financial gain. Although the three victims cooperated fully with defendant's demands and offered no resistance, he nevertheless shot and killed them one by one. He also had an extensive prior criminal record including prior prison and jail terms. Defendant attempts to mitigate his personal culpability by citing his traumatic childhood and Vietnam War experiences and resulting PTSD. We agree with the trial court that these circumstances ultimately did not affect defendant's capacity to appreciate the criminality of his conduct or to conform his

71

conduct to the requirements of the law. Defendant's actions at the time of the murders showed a rational, logical, intelligent, and calculated thought process, and his efforts to destroy evidence and to avoid capture by fleeing across the country amply demonstrate his awareness of the wrongfulness of his actions.

In light of the evidence and relevant considerations, we conclude defendant's sentence is not disproportionate to his personal culpability, nor does it shock the conscience.

### C. Challenges to California's Death Penalty Scheme

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme, based upon the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. As he acknowledges, we have previously considered and consistently rejected these contentions in prior cases. Presented with no reasons that compel reconsideration, we adhere to those decisions as follows.

Section 190.2 is not impermissibly overbroad. Specifically, the various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly broad or expansive, either on their face or as interpreted by this court. (E.g., *Jenkins, supra,* 22 Cal.4th at p. 1050; see also *Brown v. Sanders* (2006) 546 U.S. 212, 221 [recognizing that the special circumstances listed in section 190.2 are designed to satisfy the narrowing requirement].)

Section 190.3, factor (a), does not, on its face or as interpreted and applied, permit the " 'arbitrary and capricious' " or " 'wanton and freakish' " imposition of a sentence of death. (E.g., *People v. Brasure* (2008) 42 Cal.4th 1037, 1066; see *Tuilaepa v. California* (1994) 512 U.S. 967, 976 ["The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."].)

72

Neither the federal nor the state Constitution requires the penalty phase jury to make unanimous findings concerning the particular aggravating circumstances, find the truth of every fact supporting all aggravating factors beyond a reasonable doubt, or find beyond a reasonable doubt the aggravating factors outweigh the mitigating factors and death is the appropriate sentence. (E.g., *People v. Howard* (2008) 42 Cal.4th 1000, 1031; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255.) The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee (see *Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not alter these conclusions. (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1250 & fn. 22.)

Written or other specific findings by the jury regarding the aggravating factors are not constitutionally required. (E.g., *People v. Friend* (2009) 47 Cal.4th 1, 90.)

Intercase proportionality review is not constitutionally required. (*Moon, supra,* 37 Cal.4th at p. 48; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51.)

The use of adjectives such as "extreme" in section 190.3, factors (d) and (g), or "substantial" in section 190.3, factor (g), do not serve as improper barriers to the consideration of mitigating evidence. (E.g., *People v. Cruz* (2008) 44 Cal.4th 636, 681.)

The trial court was "*not* required to instruct the jury as to which of the listed sentencing factors are aggravating, which are mitigating, and which could be either" mitigating or aggravating, depending upon the jury's appraisal of the evidence. (*People v. Manriquez* (2005) 37 Cal.4th 547, 590, italics added; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 509 ["The aggravating or mitigating nature of the factors is self-evident within the context of each case."].)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by not

73

providing certain procedural protections afforded to noncapital defendants. (E.g., *People v. Cruz, supra,* 44 Cal.4th at p. 681.)

We reject the argument that the use of capital punishment "as regular punishment" violates international norms of humanity and decency and hence violates the Eighth Amendment of the United States Constitution. "California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44.)

Lastly, we find no state or federal constitutional violation when the asserted defects in California's death penalty scheme are considered collectively. (*People v. Lucero* (2000) 23 Cal.4th 692, 741.)

## DISPOSITION

For the foregoing reasons, the judgment is affirmed in its entirety.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Cunningham
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S051342
**Date Filed:** July 2, 2015
_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Michael A. Smith


_____

**Counsel:**

Brian A. Pori and Mordecai Garelick, under appointments by the Supreme Court, for Defendant and
Appellant.

Edmund G. Brown, Jr., and Kamala G. Harris, Attorneys General, Dane R. Gillette, Chief Assistant
Attorney General, Gary W. Schons, Assistant Attorney General, Annie Featherman Fraser and Ronald A.
Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mordecai Garelick
101 Second Street, Suite 600
San Francisco, CA  94105
(415) 495-0500

Ronald A. Jakob
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2332